17243

J. S. BOBO *et al.,* Appellants, v. CITY OF SPARTANBURG *et al.,* Respondents

(96 S. E. (2d) 67)

*Rufus M. Ward, Esq.,* of Spartanburg, *for Appellants,*

*Edwin P. Perrin, Esq.,* of Spartanburg, *for City of Spartanburg èt al., Respondent,*

*T. Sam Means, Jr., Esq.,* of Spartanburg, *for Spartanburg Center, Inc., Respondent,*

398

December 31, 1956.

LEGGE, Justice.

Appellants, citizens and taxpayers of the County and City of Spartanburg respectively, seek in this action a declaratory judgment as to the validity of an agreement between the City of Spartanburg and Spartanburg Center, Inc., a private corporation, whereby it is proposed that the city convey to Spartanburg Center, Inc., a portion of the public area known as Morgan Square in exchange for certain real estate owned by Spartanburg Center, Inc., and sell to that corporation another portion of said Morgan Square. Appeal is from the decree of the circuit court upholding the agreement.

By deed dated September 21, 1790, Thomas Williamson conveyed to the Justices of the newly created County of Spartanburg two acres of his land, upon which the county buildings had been erected. The county ceased to exercise control or dominion over this area when the City of Spartanburg was incorporated in 1831; and since then the city has continuously treated it as its own. The county buildings were removed from it more than a century ago. Now in the heart of the city, it has for many years been used as a public square and for the movement and parking of vehicular traffic. West Main Street traverses the southernmost portion of it; West Dunbar the northernmost. Near its western end stands a monument honoring General Morgan, of Revolutionary fame; and it is generally known as Morgan Square. Extending eastward from Morgan Square to North Church Street, and lying between West Dunbar on the north and West Main on the south, is property of Spartanburg Center, Inc.

By Joint Resolution of the General Assembly approved February 25, 1954, XLVIII Stat. at L. 2503, which recited the abandonment by the county, the exercise by the city of control and dominion since 1831, and the desire of both city and county that title be vested of record in the city, the County Board of Spartanburg County was directed to execute and deliver a quitclaim deed on behalf of the county conveying to the City of Spartanburg all of the right, title and interest of the county in and to the Morgan Square area; and such deed was thereafter executed under date March 19, 1954, and delivered.

On February 27, 1954, pursuant to a resolution of its city council, the City of Spartanburg entered into a written agreement with Spartanburg Center, Inc., whereby:

1. The Company agreed to convey to the City certain property on the west side of North Church Street, certain property on the north side of West Main Street, and certain property on the south side of West Dunbar Street, aggregating in area 4,741 square feet; and the City agreed to convey to the Company, in exchange therefor, a portion of Morgan Square having the same area and lying to the west of the buildings fronting on the east side of Morgan Square; and

2. The City agreed to convey to the Company, for the sum of $41,200.83, a portion of Morgan Square containing 2,985 square feet and lying to the west of the portion to be conveyed to the Company in the exchange before mentioned.

The agreement was expressly conditioned upon:

(a) Enactment by the General Assembly of necessary legislation authorizing and directing the conveyance by the County of Spartanburg to the City of all right, title and interest that the county might have in and to the properties proposed to be conveyed by the City to the Company;

(b) Decision by the Supreme Court of South Carolina, in a proper suit, upholding the validity and legality of the contemplated conveyances;

(c) Receipt by the Company of binding and definite commitments for long-term leases from tenants who will occupy the new building or buildings to be erected by the Company on its retained property and the property to be conveyed to it by the City;

(d) Receipt by the Company of a binding and definite commitment from lending institutions to advance the necessary funds with which to finance the construction of the new building or buildings;

(e) Submission to and approval by the City Council of the type and design of the new building or buildings to be erected by the Company;

(f) The Company's ability to convey its exchange property to the City free of all leases and claims;

(g) Provision by the Company for suitable parking spaces necessitated by the construction of the new building or buildings; and

(h) Inclusion, in the deed from the City, of the express condition that the Company will erect a new building or buildings on the property in accordance with the agreement.

The agreement further provided:

1. That the Company would

(a) Bear the cost of the lawsuit to determine the validity and legality of the proposed conveyances;

(b) Demolish the old buildings now on its property and begin construction of the new building or buildings on its retained property and the property acquired by it from the City within one year from a favorable and final decision in the lawsuit before mentioned;

(c) Furnish adequate guaranty to the City that, barring conditions and contingencies beyond the Company's control, the building or buildings would be completed within eighteen months after commencement of construction;

(d) Provide adequate off-street loading spaces for the businesses to be conducted in the new building or buildings; and

(e) Pay for the cost of preserving or moving existing utility lines within the areas proposed to be exchanged and conveyed, unless unusual difficulties and conditions should be encountered thereabout, in which event the cost would be equitably adjusted between the City and the Company; and

2. That the City would provide for necessary and adequate sidewalks around the new building or buildings.

It is undisputed that the properties proposed to be exchanged are equal in value as well as in area, and that the agreed price at which the city proposes to sell the other property, and which was arrived at by appraisers of the Spartanburg Real Estate Board at the request of the city, is fair and reasonable. It is apparent, also, that as the result of the proposed sale and exchange the city will be enabled to proceed with a much-needed widening of North Church and West Dunbar Streets without detriment to the movement of traffic in the Morgan Square area; and that the demolition of the old buildings and the erection of one or more new buildings in their place will result not only in additional revenue by way of taxes, but also in the general public benefits to be derived from the improvement of the city's shopping district and the enhancement of property values in the adjacent area. The circuit court's finding to that effect is not questioned.

We note from the Agreed Statement that Spartanburg County and its County Board, which had answered the complaint, denying for lack of information the allegations relating to the agreement between the City and the Company, and admitting the others, including those relating to the county's abandonment of dominion over the Morgan Square area and to its quitclaim deed to the city in 1954, "are not represented in this appeal, because the County has no further interest in the property".

By their exceptions to the circuit decree appellants contend that the proposed sale and exchange on the part of the city is: (a) prohibited by Article III, Section 31 of the

Constitution of this State; and (b) *ultra vires* and contrary to public policy.

The provisions of Article III, Section 31 here invoked are:

"Lands belonging to or under the control of the State shall never be donated, directly or indirectly, to private corporations or individuals, or to railroad companies. Nor shall such land be sold to corporations, or associations, for a less price than that for which it can be sold to individuals."

In *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596, 598, the plaintiff sought to enjoin the conveyance of a reclaimed low water lot by the city to a private corporation in consideration of the latter's agreement to erect a tourist hotel thereon in accordance with prescribed plans and specifications. By the Act of August 13, 1783, VII Stat. at L. p. 97, incorporating the city, this and other vacant low water lots had been granted to the city council and their successors, "for the use and advantage of the said city, to be leased, sold, improved on, or otherwise disposed of, as to the said city council shall appear most conducive to the welfare and advantage of the said city, and the inhabitants thereof." In that case the court, construing the constitutional provision above quoted, said:

"While all lands within the state's borders are at all times in a sense 'under the control of the state' in its governmental capacity—that is, subject to regulation and appropriation in the legitimate exercise of its powers of police and of eminent domain—manifestly, we think, the reference in this constitutional provision is to public lands belonging to and controlled by the state in its capacity as sovereign proprietor. Had the land here involved been granted by the state to an individual, and subsequently conveyed to the city council, it would scarcely be contended that at the time of the adoption of the Constitution of 1895 it was land 'belonging to or under the control of the state.' "

This reasoning is appropriate to the case in hand. The Morgan Square area was, in 1790, part of a plantation owned by Thomas Williamson, and held

by him, as all privately owned lands are held, under original grant from the state. Neither then nor subsequently was the area in question land "belonging to or under the control of the State" within either the letter or the reasonable intendment of Article III, Section 31. Moreover, even if such were not the case, the proposed transaction evidences no violation of Article III, Section 31, for no donation is involved and the record does not suggest that the contemplated sale is for a less price than that for which the property could be sold to individuals.

We come now to the contention that the proposed transaction is, as to the city, *ultra vires* and against public policy. It is to be noted, in approaching this question, that neither in the conveyance in 1790 to the county nor in the quitclaim in 1954 to the city was there dedication of the area in question to a specific public purpose, or other restrictive provision as to user. The former conveyance was to the Justices of Spartanburg County "and their successors as trustees of the said County and (for) the use of the said County forever"; the latter merely transferred to the city all of the right, title and interest of the county in said property. Cf. *Ehrhardt v. City Council of Charleston,* 215 S. C. 390, 402, 55 S. E. (2d) 344, 349.

In December, 1901, the City of Spartanburg was re-incorporated under the provisions of the general Act, No. 377 of Act of Feb. 19, 1901, XXIII Stat. at L. 648, for the incorporation of cities of more than five thousand inhabitants; and Section 11 of that Act, now Section 47-230 of the 1952 Code, became a part of its charter provisions. Section 47-230 reads as follows:

"The corporate name of every city or town incorporated under chapter 4 or chapter 5 of this Title shall be 'the city (or town) of . . . . . . . . . . . ,' and by such corporate name such city or town may sue and be sued and plead and be impleaded in any court of law or equity in this State and may purchase, hold, enjoy and possess, for the use of city or town in perpetuity or for a term of years, any estate,

either real; personal or mixed, and sell, alien and convey any such estate at will. Such city or town shall have and keep a common seal, which shall be affixed to all ordinances passed by the mayor and the aldermen thereof."

By Section 15 of the same Act, now Section 477-1327 of the 1952 Code, such cities were given authority, whenever the city council should deem it necessary for the improvement or convenience of the city, to open new streets and to close, widen, or otherwise alter those already in use.

The power of alienation given by Section 47-230 is not restricted to property held in proprietary, as distinguished from governmental, capacity. It extends to all property owned by the municipality. *Carter v. City of Greenville,* 175 S. C. 130, 135, 178 S. E. 508, 510. Indeed, as pointed out in the *Carter case,* under the doctrine long established in this State no distinction is recognized between governmental and so-called private functions of municipalities, and all municipally owned property is deemed held in a fiduciary capacity for the benefit of the citizens of the municipality. We agree with the Circuit Judge in his conclusion that the City of Spartanburg has the power, under Section 47-230, to make the proposed sale and exchange of properties. The power to buy and sell includes the power to exchange. *Carter v. City of Greenville, supra.*

The proposed transaction being within the power of the city, it is not within our province to inquire into its advisability. That is a matter within the discretion of the city council, whose decision we may not disturb except upon a clear showing of fraud or abuse of authority. *Carter v. City of Greenville, supra; Green v. City of Rock Hill,* 149 S. C. 234, 262, 263, 147 S. E. 346, 356. There is no such showing here. On the contrary, it appears not only that the proposed exchange is for property of equivalent value and the sale for adequate monetary consideration, but also that the transaction is supported by the further consideration of substantial returns reasonably to be expected in tax revenues, and of other public benefits, includ-

ing the relief of traffic congestion by the widening of North Church and West Dunbar Streets that will thus be made possible. These considerations negative the suggestion of manifest abuse of the city council's discretionary powers.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and Moss, JJ., concur.