## 18678

Jack R. ELLIOTT, Appellant, v. Robert E. McNAIR, Governor of the State of South Carolina, Daniel R. McLeod, Attorney General of the State of South Carolina, Grady L. Patterson, Jr., Treasurer of the State of South Carolina, John H. Mills, Comptroller General of the State of South Carolina, Edgar A. Brown, Chairman of the Senate Finance Committee, Robert J. Aycock, Chairman of the Ways and Means Committee of the House of Representatives, constituting the Budget and Control Board of the State of South Carolina; C. Laney Talbert, Chairman, Frank Sumner Smith, Jr., Vice Chairman, and John L. Cotton, Joe Taylor and J. Watson Wharton constituting The Richland County Board of Administrators, and Rockwell Manufacturing Company, Respondents.

(156 S. E. (2d) 421)

76

78

*Messrs. Marchant, Bristow & Bates,* of Columbia, *for Appellant,*

*Messrs. Daniel R. McLeod, Attorney General, Belser, Belser & Baker* and *Joseph D. Sapp,* of Columbia, and *Sinkler, Gibbes & Simons,* of Charleston, *for Respondents,*

July 14, 1967.

Moss, Chief Justice.

This action is one under the "Uniform Declaratory Judgments Act", Sections 10-2001 *et seq.,* 1962 Code of Laws, brought by Jack R. Elliott, the appellant herein, a taxpayer of Richland County, South Carolina. The purpose of the action is to determine the constitutionality of the recently enacted Industrial Revenue Bond Act, approved March 21, 1967, hereinafter referred to as the Act, and the validity of certain actions to be taken pursuant thereto. The appeal here is from a decree entered by the Court of Common Pleas for Richland County upholding the validity of the Act and certain proposed actions of the respondents pursuant thereto. There are no factual issues involved and the matters to be determined are questions of law. However, we do recite a brief résumé of the facts.

The respondent, Rockwell Manufacturing Company, hereinafter referred to as Rockwell, is a Pennsylvania Corporation, which some time ago announced its intention to establish a manufacturing enterprise in Richland County. To this end Rockwell acquired, on March 23, 1967, a tract of land containing forty acres in Richland County as a site for the construction of the proposed manufacturing enterprise, hereinafter referred to as the project.

The "County Board" of Richland County, who are respondents herein, and Rockwell have entered into an agreement, under the terms of which:

1. Rockwell proposes to convey to the County Board the forty acre tract for the same price as it paid for the same.

2. The County Board will issue Richland County Industrial Revenue Bonds in the amount of $1,000,000.00 and will use the proceeds (after expenses in connection with the transaction) to pay the purchase price of the forty acre tract and use the balance to pay the costs of constructing thereon a manufacturing plant.

3. The County Board will lease the tract and manufacturing plant to Rockwell at a rental sufficient to enable the County Board to meet the payment of the principal and interest on the bonds and to discharge its obligations pursuant to the lease and indenture hereafter referred to.

4. The County Board will secure its bonds with a trust indenture to a bank, as trustee, which will include covenants and undertakings of the sort generally found in such instruments, and which will provide that upon the failure of the County Board to pay the principal or interest on the bonds, or meet any of its obligations under the indenture, the trustee may foreclose the mortgage, have the property sold and apply the proceeds of such sale to the payment of the principal and interest of the bonds.

5. By the terms of the lease, Rockwell proposes to pay, to Richland County, to that School District of Richland County wherein the project is located, and to all political divisions or subdivisions which now or henceforth might include the sight of the project, as additional rent, those sums which Rockwell would have paid to Richland County, the School District and the other political divisions or subdivisions, had Rockwell itself been the owner of the tract of land and the project thereon situate.

6. The lease will contain several provisions granting rights to Rockwell, including either a provision granting to Rockwell the absolute option to purchase the project for the sum equal to the aggregate at such time due on the bonds plus a nominal sum, or a provision permitting Rockwell to renew its lease after the original term for a nominal sum.

In its return, Rockwell states that the reduced rate of interest available to it by reason of the tax-exempt feature

of the bonds is a decided factor in establishing the economic feasibility of its undertaking. The plant of Rockwell when completed will employ some three hundred and forty persons.

The respondents, who are members of the State Budget and Control Board, hereinafter referred to as the State Board, have admitted that they have tentatively given favorable consideration to the application of the County Board for permission to issue bonds and will do so unless it be held that the Act is unconstitutional.

Thus it would appear that all conditions imposed by the Act have been, or will be, duly met, so that squarely at issue is the constitutionality of the Act and the validity of the actions of the respondents pursuant thereto.

Industrial Revenue Bond financing represents a type of financing of relatively recent origin. It dates back to the Mississippi Act of 1936 which permitted the issuance of both general obligation bonds and revenue bonds for the purpose of financing industrial enterprises. See the case of *Albritton v. City of Winona,* 181 Miss. 75, 178 So. 799, 115 A. L. R. 1436. More than thirty states have now enacted statutes which permit this type of financing, although only few besides Mississippi permit the issuance of general obligation bonds. In by far the great majority of instances, state statutes which authorize this type of financing, limit the bonds to those which are payable solely from the revenues of the particular project or enterprise. Accordingly, it is apparent, as in the case here, that the sole obligation of the political unit issuing the bonds is to apply the revenues resulting from the project or from its leasing to the payment of the principal and interest of the bonds. Our Act is quite specific, and Section 4 thereof provides: "Bonds and interest coupons issued under authority of this Act shall never constitute an indebtedness of such county within the meaning of any state constitutional provision or statutory limitation and shall never constitute nor give rise to a pecuniary liability of the county or a charge against its general credit or

taxing powers, and such fact shall be plainly stated on the face of each bond."

While the several states of the United States, and ■ their political subdivisions, have long undertaken public works which indirectly provide benefits for those who would undertake industrial enterprises, such as highways, airports, port facilities, waterworks and sewer systems, and other similar undertakings, until the advent of industrial bond financing, the issuance of bonds, to pay the cost of a particular manufacturing enterprise to be operated by a private concern was unheard of. Indeed, it seems to have been unquestioned that private corporations should do their own financing, leaving public financing confined to projects designed for the benefit of the general public. It is argued that the doctrine which sanctions industrial bond financing runs counter to the private enterprise system. However, it is our duty to examine the Act to see if it, or any provision therein, violates specific constitutional limitations. Our constitution is not a grant of power, but a limitation on what, absent limitations therein, would be a plenary power in the people or their elected representatives. Accordingly, it is not sufficient for us to find that an act is offensive to what may be prevailing notions of the proper sphere for state governments. It is necessary, in order for us to strike down an act of the General Assembly to find that it offends specific provisions of the state constitution which have limited and circumscribed legislative action in that area.

This appeal raises numerous questions concerning the Act and the actions of the respondents pursuant thereto. Contrary to the language of many state statutes which authorize industrial revenue financing by incorporated cities and towns or state and other authorities, the power to undertake this type of financing under the Act rests with the governing boards of the forty-six counties of this state. The power of a county to levy taxes and issue bonds is strictly limited by Article X, Sec. 6, of the 1895 Constitution of this State. It is there provided:

"* * * The General Assembly shall not have power to authorize any County or township to levy a tax or issue bonds for any purpose except for educational purposes, to build and repair public roads, buildings and bridges, to maintain and support prisoners, pay jurors, County officers, and for litigation, quarantine and Court expenses and for ordinary County purposes, to support paupers, and pay past indebtedness. * * *"

■ It is contended that the Act here violates the foregoing provision of the Constitution. It seems clear from our decisions that the limitation upon the power of the General Assembly to authorize a county to issue bonds relates solely to general obligation bonds payable from the proceeds of *ad valorem* tax levies. *Park v. Greenwood County,* 174 S. C. 35, 176 S. E. 870, and *Benjamin v. Housing Authority of Darlington County,* 198 S. C. 79, 15 S. E. (2d) 737.

This question first arose in the *Park case* when the right of Greenwood County to issue bonds for the construction of an electric generating system was challenged. The holding of this Court was specific:

"The second question presented is whether the revenue bonds sought to be issued will constitute a debt within the constitutional limitations. See section 7 of article 8, and sections 5 and 6, of article 10.

"This is no longer an open question, since we have twice declared that the revenue bonds proposed under this act are not debts in a constitutional sense."

In support of the foregoing holding, the Court cited *Cathcart v. City of Columbia,* 170 S. C. 362, 170 S. E. 435, and *Roach v. City of Columbia,* 172 S. C. 478, 174 S. E. 461.

■ In the *Benjamin case* the right of the Housing Authority of Darlington County to issue revenue bonds for the financing of a low cost housing project was challenged. The principal of the bonds and the interest

thereon were payable from revenues derived from the operation of the housing project. It was held that the revenue bonds issued were not debts in a constitutional sense, and this court was careful to point out that if the county of Darlington were responsible for the payment of any portion of the contemplated bond issue, or if it were in contemplation that a tax be levied on property in said county to pay any portion of the cost or maintenance of this project, it would be in violation of Article X, Section 6, of the Constitution. Since the bonds authorized here are payable only from the revenues derived from the project built by the proceeds of the bonds, the limitation of the quoted provision of Article X, Section 6, is inapplicable.

A similar result applies to the contention that the Act violates the first sentence of Article X, Section 6, of the Constitution, which provides that: "The credit of the State shall not be pledged or loaned for the benefit of any individual, company, association or corporation." We agree with the holding below that the proscription here runs not only to the state but to its political subdivisions, for as noted by the court below, if the language applied purely to the state itself, then there might be done by indirection that which is specifically prohibited to be done directly. Nevertheless, the word "credit" as here used was intended to protect the state against pecuniary liability, and since the Act very clearly protects the counties of the state from pecuniary involvement, the objection raised by the appellant on this ground has no legal merit.

The question as to whether the Act is violative of Article I, Section 5, of the Constitution, as constituting legislation for private rather than for public purpose, is a question which has given us much concern. All legislative action must serve a public rather than a private purpose. There is no doubt of the fact that the economy of South Carolina has undergone a startling change in the last few years. The inhabitants of this state were for many years dependent almost entirely upon agriculture and

related industries for their livelihood. Agriculture no longer provides the livelihood of those who only a few years ago were almost entirely supported by it. The Act here under consideration recites that South Carolina has promoted industrial expansion and has actively supported the State Development Board, for which public moneys have been appropriated, and through it has endeavored to promote the industrial development of the state for the welfare of its inhabitants. This has been done as a matter of state policy. It is the purpose of the Act to empower the governing bodies of the several counties of the state, under the terms and conditions of this Act, to provide such assistance and to that end to acquire, own, lease and dispose of properties, through which the industrial development of the state will be promoted, and trade developed by inducing manufacturing, and other commercial enterprises to locate in and remain in the state, and to utilize and employ the manpower, agricultural products and natural resources of the state.

In the case of *Duke Power Co. v. Bell,* 156 S. C. 299, 152 S. E. 865, decided in 1930, this court observed that:

"Ours is distinctively an industrial age, and the prosperity of counties and of states, as well as of cities and towns, is becoming increasingly dependent upon the opportunity afforded their people for employment in manufacturing indutries."

The activities of the state in the development of its ports has reduced transportation costs and made new markets available in a manner which has been of significant benefit to the industries of the state, thus indirectly promoting the influx of additional industries and the expansion of existing industries. Waterworks and other utilities have been made available to industries located beyond the corporate limits of municipalities and have thus done much to promote expanded industrial activity. We noted in the case of *Green v. City of Rock Hill,* 149 S. C. 234, 147 S. E. 346:

"The general municipal purpose of a water supply is to promote the prosperity of a city. This it does by lessening

the risk of destruction of property by fire, by lowering the rate of insurance, increasing the general sense of security, and therefore the general happiness, diminishing the risk of numbers of persons being thrown out of employment, and generally in giving steadiness and confidence to the life and enterprises of a city.

"But, however important a water supply may be for purpose of fire protection, that the prosperity of a city, which it is the general purpose of a water supply to promote, is even more directly promoted by making such water supply available for, and by using it upon fair terms to supply, the needs of industries upon which the prosperity of so many modern urban communities vitally depends, would seem to be self-evident."

The Legislature has found the Act here is for a public purpose and thus a proper function of government. The question of whether an act is for a public purpose is primarily one for the Legislature, and this court will not interfere unless the determination by that body is clearly wrong.

In the case of *Fairfax County Industrial Development Authority v. Coyner*, 207 Va. 351, 150 S. E. (2d) 87, it was held that the legislative determination that the promotion of industrial development is for a public purpose and thus a proper governmental function is presumed to be correct. It was further said that courts cannot interfere with what the General Assembly has declared to be a public purpose and thus a function of government unless the judicial mind conceives that the legislative determination is without reasonable relation to the public interest or welfare and is beyond the scope of legitimate government. We quote the following from the cited case:

"The fact that the Authority proposes to issue revenue bonds for the financing and construction of an industrial facility to be leased to a private user does not make the Act unconstitutional. Even though some private individual or corporation incidentally benefits from the financing, con-

struction and use of the proposed facility, its public purpose and character are not destroyed. *Harrison v. Day, supra,* 202 Va. at pp. 972, 973, 121 S. E. (2d) at p. 619; *Button v. Day,* 205 Va. 629, 638, 139 S. E. (2d) 91, 97. Nor does the granting of an option to Karloid to purchase the property at the termination of Hazelton's lease destroy the public character of the enterprise. See *Darnell v. County of Montgomery,* 202 Tenn. 560, 308 S. W. (2d) 373, 374, 375.

"Having held that authorities created for the purpose of acquisition and development and operation of produce markets, harbor and port facilities, and marinas for public use were for a public purpose and a proper governmental function, it would indeed be an anomaly for us to say that an authority created for the purpose of stimulating and promoting industrial development, which would contribute to the economy of the State and create jobs for its people, was not for a public purpose and thus not a proper function of government."

We conclude that the Act here was for a public purpose and represents merely an expansion of the established legislative policy of improving the industrial climate of South Carolina in order to provide for the welfare and prosperity of its inhabitants and the mere fact that special benefits result by reason of its existence does not destroy the public purpose which promoted its enactment.

There are many cases from other jurisdictions holding that the action of political subdivisions in financing and constructing buildings to be leased to a private industry in order to promote the industrial development of a particular area of a state was for a public purpose. These decisions support our views. *Fairfax County Industrial Development Authority v. Coyner,* 207 Va. 351, 150 S. E. (2d) 87; *Le Blanc v. Police Jury of Parish of Rapides, La.* App., 188 So. (2d) 131; *City of Gaylord v. Beckett,* 378 Mich. 273, 144 N. W. (2d) 460; *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 131 N. W. (2d) 5; *State, ex rel. County Court of*

*Marion County v. Demus,* 148 W. Va. 398, 135 S. E. (2d) 352; *Wayland v. Snapp,* Ark., 334 S. W. (2d) 633; *Darnell v. County of Montgomery,* 202 Tenn. 560, 308 S. W. (2d) 373; *Faulconer v. City of Danville,* 313 Ky. 468, 232 S. W. (2d) 80; *City of Frostburg v. Jenkins,* 215 Md. 9, 136 A. (2d) 852; *Newberry v. City of Andalusia, Ala.,* 57 So. (2d) 629, and *In re* Opinion of the Justices, Ala., 53 So. (2d) 840.

There are decisions contrary to the views hereinbefore expressed. These are predicated on the premise that the expenditure of the proceeds of the bonds involves an expenditure of public moneys for private purposes. The leading and much quoted opinion is that of the Florida Supreme Court in *State v. Town of North Miami,* 59 So. (2d) 779. There the court held that once the public agency received the proceeds of the bonds, the money became public money. The court stated:

"Our organic law prohibits the expenditure of public money for a private purpose. It does not matter whether the money is derived by *ad valorem* taxes, by gift or *otherwise.* It is public money and under our organic law public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern * * *." (Emphasis added.)

It is our view, however, that the money which will be received by the County Board in this case is impressed with a trust that it be used for the purpose for which it was obtained, the construction of the project, for which reason the money does not become public money whose expenditure would otherwise be confined to the general public good.

It is the position of the appellant that the indenture given to secure the bonds to be issued pursuant to the Act is a foreclosable mortgage and creates a debt of Richland County, and the possibility of exposing publicly owned property to a mortgage foreclosure sale would

be in violation of Article I, Section 5 and Article III, Section 31, of the Constitution.

The precise question raised here was also involved in the case of *Clarke v. S. C. Public Service Authority,* 177 S. C. 427, 181 S. E. 481, where the court had for consideration the act creating the South Carolina Public Service Authority which, among other provisions, provided for the issuance of revenue bonds of the Authority secured by a mortgage on the property to be acquired with the proceeds. In disposing of the question raised, this court said:

"* * * However, the bonds in this case are to be secured by a foreclosable mortgage, as above stated, and the question arises as to whether the giving of the mortgage will change the status of the bonds so as to bring them within the meaning of the constitutional provisions against the creation of a public debt. This court is unable to see how the giving of a mortgage over property to be acquired from the proceeds of the bonds to be sold would change the status of the bonds so, as to make them debts of the state within the constitutional inhibitions against the creation of a public debt without the vote of the people, especially when no funds, or property, acquired from taxation are involved, and the mortgage is payable solely from the revenues of the Authority. A clear statement of the rule is found in 72 A. L. R., 701, from which we quote as follows: "The weight of authority, however, supports the view that such a transaction (issuance of revenue bonds), does not create a debt or liability where no mortgage or other lien is placed on the existing property of the city. Where, however, a mortgage is imposed on property already owned by the municipality or upon other property, in addition to that purchased, to secure the purchase price, there is an indebtedness or liability within the meaning of the debt limitation. *But, according to the weight of authority, this rule does not apply where the mortgage or vendor's lien applies only to the property purchased.'*" (Italics ours.)

In the present case the record clearly shows that the mortgage will apply only to property to be purchased by the proceeds of the sale of the revenue bonds and that no property now belonging to the County or to be acquired by taxation will be covered by the mortgage.

The appellant asserts the Act here relates to more than one subject not expressed in its title and thus violates Article III, Section 17, of the Constitution. There is no merit in such contention because the Act has a single legislative objective clearly covered by its unusually lengthy title. *State ex rel. Roddey v. Byrnes,* 219 S. C. 485, 66 S. E. (2d) 33.

It is admitted that the Act here was signed in joint session of the Legislature by the President of the Senate and the Speaker *Pro Tempore* of the House of Representatives, such being the presiding officers of the Generall Assembly in attendance at that particular session. The appellant asserts that the signing of the Act by the Speaker *Pro Tempore* of the House of Representatives violates Article III, Section 18, of the Constitution, which provides that before an act shall have the force of law it shall be signed by the "President of the Senate and the Speaker of the House of Representatives." The phrase "Speaker of the House" does not relate solely to the person who holds that title but also includes the Speaker *Pro Tempore* when he is the presiding officer of the House of Representatives.

The appellant contends that the Act in authorizing a private corporation to borrow money at a lesser rate of interest, by reason of the tax-exempt feature of the bonds, than others whose loans are not exempt from taxation, affords a special privilege to such private corporation, in violation of Article I, Section 5, of the Constitution. We have held that the General Assembly has the right to make reasonable classifications of persons and property for public purposes. It is elementary that if the classification bears a reasonable relation to the legislative purpose sought to be effected, and if the constituents of each class are all treated

alike under similar circumstances and conditions, there is no infringement upon the equal protection clause of the Constitution. It is sufficient if the Act applies equally to all members of the class provided the classification is not purely arbitrary but rests upon some reasonable basis. *Duke Power Co. v. Bell,* 156 S. C. 299, 152 S. E. 865. The fact that a private corporation, coming within the provisions of the Act, may borrow money at a lesser rate of interest than others who do not qualify under the Act does not afford any special privilege to such private corporation because the provisions of the said Act apply equally to all corporations within the class provided for in said Act.

The appellant has raised the objection that the Act in requiring the payment of additional rent by Rockwell, in lieu of *ad valorem* taxation, violates Article X, Section 4, of the Constitution. The appellant argues that since Rockwell proposes to pay, as additional rent, those sums which it would have paid to Richland County, the School District and other political divisions or subdivisions, is tantamount to *ad valorem* taxation, and such has the effect of admitting that the purpose of the Act is not a public one. Article X, Section 4, has been literally followed here inasmuch as the property is not subject to *ad valorem* taxes. What this court said in the case of *Clarke v. S. C. Public Service Authority,* 177 S. C. 427, 181 S. E. 481, disposes of this question. There, we said:

"But it is contended that the Authority is exempt from paying taxes, whereas a private corporation would have to pay taxes on its properties. This cannot change the situation, because public property is never taxed, and it appears from the record that the Authority will pay into the State Treasury a portion of its revenues which will reasonably be expected to be equivalent to taxes paid by a private corporation in like situation. * * *"

The provision of the Act providing for the payment of additional rent in lieu of taxes thus follows generally the plan approved by this court in the *Clarke case.*

The Act provides that no bond shall be issued by the ■ County Board without the approval of the State Budget and Control Board of South Carolina. The Chairman of the Senate Finance Committee and the Chairman of the House Ways and Means Committee are members of the State Board. The appellant contends that the State Board, of whom the foregoing are members, is given powers which violate the provisions of Article II, Section 2, and Article I, Section 14, of the Constitution. The first of these sections forbids dual office holding and the second section requires separation of powers. The situation here is precisely that dealt with by this court in the case of *State ex rel. Ray v. Blease*, 95 S. C. 403, 79 S. E. 247. At issue in the cited case was the validity of an act empowering the State Sinking Fund Commission to issue bonds of the State to provide funds for the redemption of certain outstanding state bonds. The State Sinking Fund Commission was comprised of the Governor, the State Treasurer, the Comptroller sons who already held public office. The answer given by and Means Committee. It was alleged that the Act violated the Constitution for the reason that it was composed of per- General, the Attorney General, the Chairman of the Senate Finance Committee and the Chairman of the House Ways the court was as follows:

"It is next alleged that the act violates section 2 of article 2 of the Constitution, which provides that no person shall hold two offices of honor or profit at the same time. The specific point is that the Sinking Fund Commission is illegally constituted, in that it is composed of public officers. The answer to this objection is that membership in the commission is not an office. It merely involves the discharge of duties imposed by law upon the various officers who compose the commission,—duties which are, therefore, merely incidental to their respective offices. *State v. Porterfield*, 4 S. C. 75, 25 S. E. 39; *State v. Green*, 52 S. C. 520, 30 S. E. 683."

Since the composition of the State Board is here comparable to that of the former State Sinking Fund Commission, it is obvious that the Blease decision here controls. See also *Ashmore v. Greater Greenville Sewer District,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R. 397.

It is next contended that the Act in authorizing the County Board to include in the lease agreement to Rockwell an option granting it the right to purchase the project for a sum equal to the aggregate at such time due on the bonds plus a nominal sum or a provision permitting Rockwell to renew its lease after the original term for a nominal sum, violates the due process clause, Article V, Section 1, and the public land clause, Article III, Section 31, of the Constitution. The latter provision of the Constitution provides that lands belonging to or under the control of the state shall never be donated to private corporations and that such land shall not be sold to corporations "for a less price than that for which it can be sold to individuals". Nowhere in our decisions do we find a holding which requires public agencies to sell property at not less than full market value. Our decisions clearly hold that a public agency may exercise discretion in effecting a sale of public property and that neither public bidding is required nor is there a requirement that the maximum price be obtained. Indirect benefits to result to the public may properly be considered. *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596; *Chapman v. Greenville Chamber of Commerce,* 127 S. C. 173, 120 S. E. 584; *O'Dowd v. Waters,* 130 S. C. 232, 125 S. E. 644; *Babb v. Green,* 222 S. C. 534, 73 S. E. (2d) 699; *Bobo v. City of Spartanburg,* 230 S. C. 396, 96 S. E. (2d) 67. It follows that the action of the County Board by including in the lease agreement to Rockwell an option to purchase the project, upon the terms stated, in noway contravenes the due process or the public land clauses of the Constitution.

The argument of the appellant here assumes that the ██ adequacy of the consideration for such an option must be measured as of the time of its exercise

rather than as of the time the original lease agreement is made. The fact is that the granting of such option forms a part of the original consideration for the lease agreement, and being thus supported by a consideration deemed fully adequate by the County Board, cannot be said to amount to a donation of public property. In *Darnell v. County of Montgomery,* 202 Tenn. 560, 308 S. W. (2d) 373, and *State ex rel. County Court of Mineral County v. Bane,* 148 W. Va. 392, 135 S. E. (2d) 349, in passing upon the validity of an act similar in import to the one before this court, and in which it was provided in the lease that the lessee be granted the right to purchase the project, such provision was held valid. To the same effect see *Newberry v. City of Andalusia,* 257 Ala. 49, 57 So. (2d) 629, and *Village of Deming v. Hosdreg Co.,* 62 N. M. 18, 303 P. (2d) 920.

The Act under consideration was approved on March 21, 1967, and it was provided therein that such Act would take effect January 1, 1967. Section 13 of the Act provides that "All projects so long as County owned and the revenue derived from any lease thereof shall be exempt from all taxation in the State of South Carolina." The appellant contends that because the Act has an effective date of January 1, 1967, this makes it violative of Article I, Section 8, of the Constitution, which prohibits the enactment of any law impairing the obligation of a contract. Specifically, the appellant asserts that the Act impairs the provisions of the contracts between the County Board of Richland County and the holders of Richland County general obligation bonds, which requires the County to levy *ad valorem* taxes on all taxable property in the county for the repayment of such bonds. This objection is answered by the fact that there is no requirement in any general obligation bond act in this state which limits the plenary power of the General Assembly to provide for tax exemptions; such statute only requires that the tax levy be on all "taxable property". There can be no question but that the power in the General Assembly to prescribe what property shall be taxed

implies the power to prescribe what property shall be exempt from taxation. *Duke Power Co. v. Bell,* 156 S. C. 299, 152 S. E. 865; *Byrd v. Lawrimore,* 212 S. C. 281, 47 S. E. (2d) 728. The Act here in noway impairs the agreement between Richland County and the holders of its general obligation bonds, and does not fall within the prohibition of Article I, Section 8.

It is the position of the appellant that the retroactive feature of the Act creates a benefit to those industrial enterprises which may have become qualified to use the Act between January 1, 1967, and March 21, 1967, the latter being the date of its approval by the Governor, which is denied others which were so qualified prior to the effective date of the Act, in violation of Article I, Section 5, of the Constitution. This question is not properly before the court for consideration. Rockwell, even though it had announced its interest in the construction of an industrial enterprise in Richland County, took no steps towards this end until after the passage of the Act in question. We cannot in this case decide what the rights of "others" may be under the Act. Certainly, the appellant cannot espouse their cause.

The Act here contains two short statutes of limitation. In Section 10 Counties owning surplus lands not donated to public purposes, are permitted to use such property for projects provided they receive the reasonable value thereof. It is there provided that once a County Board determines the reasonable value of such land, public notice thereof shall be given in the manner provided by the Act, so that any taxpayer might challenge its finding within twenty days but not thereafter. It is provided in Section 14 of the Act, that following the approval of any project, the State Board shall cause an advertisement of its action to be published in a newspaper in the county where the project is to be located and that within twenty days, but not thereafter, any aggrieved party may challenge such action. The appellant asserts that the statutes of limitation set forth in the Act are so short as to deprive the appellant and others

similarly situated a reasonable opportunity to challenge the actions which may be taken pursuant to the Act and such is in contravention of Article I, Section 5, of the Constitution. The practical necessity for a short statute of limitation is obvious. It is quite apparent that protracted delays and the uncertainty of litigation could seriously and adversely affect any particular undertaking had pursuant to the Act. In the light of these circumstances the time permitted for challenge and the statutes of limitation are not offensive to due process. *Morgan v. Feagin,* 230 S. C. 315, 95 S. E. (2d) 621.

For the reasons above stated, the relief sought by the appellant must be denied. The Act here under consideration is a valid exercise of the legislative power of the General Assembly of this State.

·All of the exceptions of the appellant are found to be without merit and the judgment of the lower court is accordingly.

Affirmed.

LEWIS, BUSSEY, BRAILSFORD, and LITTLEJOHN, JJ., concur.