19378

Richard W. HUNT, Individually and representing all of the taxpayers of the State of South Carolina, Appellant, v. Robert E. McNAIR, Governor of the State of South Carolina, et al., Respondents.

(187 S. E. (2d) 645)

*Messrs. Bryant & Fanning*, of Orangeburg, and *Robert McC. Figg, Jr.*, of *Robinson, McFadden, Moore & Pope*, Columbia, *for Appellant.*

*Messrs. Daniel R. McLeod, Atty. Gen.,* and *C. Pinckney Roberts,* Columbia, and *Sinkler, Gibbs & Simons,* Charleston, for Respondents.

March 2, 1972.

*Per Curiam:*

This case was initially decided by the Court of Common Pleas for Charleston County. The order of that court was appealed. This Court heard the same, and by opinion filed on October 22, 1970, affirmed the order of the lower court. See *Hunt v. McNair, et al.,* 255 S. C. 71, 177 S. E. (2d) 362 (1970).

Thereafter an appeal was taken to the Supreme Court of the United States. On June 28, 1971, 403 U. S. 945, 91 S. Ct. 2276, 29 L. Ed. (2d) 854, that Court remanded the case to us for "reconsideration in the light of . . . decisions in *Lemon, et al. v. Kurtzmann et al.,* 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. (2d) 745; *Tilton et al. v. Richardson et al.,* 403 U. S. 672, 91 S. Ct. 2091, 29 L. Ed. (2d) 790; *Earley et al. v. DiCenso et al.,* 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. (2d) 745, and *Robinson et al. v. DiCenso et al.,* 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. (2d) 745, decided June 28, 1970." All of these cases deal with freedom of religion, the establishment clause and the first amendment to the Constitution of the United States.

By reason of the directive of the Supreme Court of the United States we must now determine in the light of these cases whether the Educational Facilities Authority Act (enacted by the General Assembly of South Carolina in 1969) and its proposed use and application, violates the first amendment to the Constitution of the United States.

Under the provisions of the Educational Facilities Authority Act (herein referred to as the Act), the Budget and Control Board of the State of South Carolina (the Board), acting as the Educational Facilities Authority (the Authority) is authorized to provide financing for institutions of higher learning by its issuance of revenue bonds

payable solely out of the revenues derived by the Authority from the particular project or institution for which they are issued. The bonds are secured by a mortgage on the project so financed.

The Act states that it shall not include "any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination."

The Act declares the Authority to be a body politic, and declares its purpose to be "to assist institutions for higher education in the construction, financing and refinancing of projects." It empowers the Authority to adopt rules and regulations for the conduct of its affairs.

The defendant, Baptist College at Charleston, a South Carolina eleemosynary corporation (the College) has petitioned the Authority seeking the preliminary approval of the Authority for the issuance of revenue bonds not exceeding $3,500,000.00 pursuant to the said Act for the purpose of (a) paying off outstanding indebtedness of the Baptist College Foundation incurred for the purposes of acquiring certain equipment and trailers utilized as a part of the College's educational plant (the payment for which the College is responsible) in the amount of approximately $275,000-.00; (b) reimbursing in part the College's Current Fund for moneys advanced to the College's Plant Fund used to purchase school equipment and other capital improvements and for the payment of the aforesaid obligation of the Baptist College Foundation; and (c) refunding an outstanding indebtedness of the College in the amount of approximately $2,500,000.00 represented by the College's first mortgage serial bonds dated July 1, 1966.

In accordance with the provisions of the Act the College proposes to convey substantially all of its campus to the State of South Carolina at no cost to the State. The Au-

thority would then lease the property so conveyed to the College under a lease agreement by which the College would be obligated to operate and maintain it as an institution of higher learning and to pay to the Authority or a designee, rentals in an amount sufficient to meet the payments of principal and interest as they become due on the proposed revenue bonds. The Authority would issue the revenue bonds and make the proceeds available to the College for the purposes aforesaid and the bonds would be repayable solely from the rentals to be paid by the Baptist College under the lease agreement. The bonds would be further secured by a Trust Indenture (mortgage) between the Authority and a bank, as trustee (acting in lieu of the Authority), which would constitute a foreclosable lien on the property conveyed to the State. When the bonds are paid the Authority would deed the property back to the College subject to restrictions as required by the rules set forth hereinafter. The debt is not a debt or obligation of the State.

Excluded from the property to be conveyed by the College to the State is the library which is being financed in part by a loan from the Department of Health, Education and Welfare; a dormitory which is being financed in part by a loan from the Department of Housing and Urban Development; a dormitory which is currently under lease to the College, and the Physical Education Building where facilities which are used for religious worship are located. Excluded also are approximately 50 acres of land forming a part of the College campus.

By petition to the Authority the College has sought to avail itself of the Act. The Authority, by resolution, has given preliminary approval to the financing arrangement. Thereafter, this action was commenced by the plaintiff to enjoin the defendants from further pursuit of the plan.

The overall purpose of the Act is to permit colleges to borrow funds advantageously by using the State's income tax-free basis as relates to the issuance of bonds. Bondholders are not required to pay income tax on dividends or

interest from bonds issued by the State; accordingly, a lower rate of interest is available which inures to the benefit of the College. Under the plan the State issues the bonds, but the money goes to the College. The College, and not the State, pays the bonds through rentals paid the Authority or trustee. There is no cost to the State incident to the entire plan of financing.

Pursuant to the power given to the Authority to adopt rules, the Authority has adopted rules as follows:

"1. Each Lease Agreement must contain a covenant obligating the Institution that neither the leased land, nor the facility located thereon, shall be used for sectarian instruction or as a place of religious worship, or in connection with any part of the program of a school or department of divinity of any religious denomination.

"2. Each Lease Agreement shall contain a provision permitting the Authority or any agent of the Authority to conduct such inspections as may be necessary to determine whether the leased premises, or any portion thereof, or any facility located thereon, is being used or has been used for sectarian instruction or as a place of religious worship, or in connection with any part of the program of a school or department of divinity for any religious denomination.

"3. Each Lease Agreement shall contain an appropriately worded provision providing that the covenant referred to in Paragraph 1 above may be enforced at the instance of the Authority, the Attorney General of South Carolina, or any taxpayer of South Carolina by a proceeding in any court of competent jurisdiction, by injunction, *mandamus* or other means.

"4. If the Lease Agreement contains a provision permitting the Institution to repurchase the project upon payment of the bonds, then in such instance the Lease Agreement shall provide that the Deed of reconveyance from the Authority to the Institution shall be made subject to the condition that so long as the Institution, or any voluntary

grantee of the Institution, shall own the leased premises, or any part thereof, that no facility thereon, financed in whole or in part with the proceeds of the bonds, shall be used for sectarian instruction or as a place of religious worship, or used in connection with any part of the program of a school or department of divinity of any religious denomination. The condition may provide, at the option of the Institution, that if the leased premises shall become the subject of an involuntary judicial sale, as a result of any foreclosure of any mortgage, or sale pursuant to any order of any court, that the title to be vested in any purchaser at such judicial sale, other than the Institution, shall be in fee simple and shall be free of the condition applicable to the Institution or any voluntary grantee thereof."

In our previous opinion, *Hunt, supra,* we said: "Having held that neither the credit of the State nor the property of the State is involved, it follows that this constitutional provision [the establishment clause] is not violated. There is no conflict between the preservation of religious freedom and the preservation of higher education under the Educational Facilities Authority Act."

Pursuant to the ruling of the Supreme Court of the United States on June 28, 1971, counsel for plaintiff and defendants have re-argued the case and submitted additional briefs in the light of *Lemon, Tilton, Earley* and *Robinson.*

Plaintiff now submits three questions for the consideration of this Court:

"QUESTION I

"Under the Educational Facilities Authority Act and the proposed transaction thereunder between the Baptist College at Charleston and the State of South Carolina acting through the State Budget and Control Board, is the State impermissibly involved in the Institution's affairs in contravention of the Religion Clauses of the First Amendment?

"QUESTION II

"Does the proposed transaction afford State sponsorship and financial support to the Baptist College at Charleston's total program of sectarian as well as secular purposes in contravention of the Religion Clauses of the First Amendment?

"QUESTION III

"Does the proposed transaction constitute State financial support of the Baptist College at Charleston in contravention of the Religion Clauses of the First Amendment, insofar as the project facilities may be authorized to be used for religious purposes by a purchaser at a judicial sale under foreclosure of a mortgage given thereon by the Authority or by the Institution itself subsequent to its repurchase thereof?"

The language of the first amendment to the Constitution of the United States and the language of Article 1, Section 4, of the Constitution of South Carolina are, for all intents and purposes, the same. Accordingly, our reasoning is applicable to both constitutional provisions. The establishment clauses are intended to afford protection against sponsorship, financial support and active involvement of the government in religious activity. *Walz v. Tax Commission*, 397 U. S. 664, 90 S. Ct. 1409, 25 L. Ed. (2d) 697 (1970).

The legislative intent is set forth in the Act as follows:

"To Create an Educational Facilities Authority

"(A) It is hereby declared that for the benefit of the people of the State, the increase of their commerce, welfare and prosperity and the improvement of their health and living conditions it is essential that this and future generations of youth be given the fullest opportunity to learn and to develop their intellectual and mental capacities; that it is essential that institutions for higher education within the State be provided with appropriate additional means to

assist such youth in achieving the required levels of learning and development of their intellectual and mental capacities; and that it is the purpose of this section to provide a measure of assistance and an alternative method to enable institutions for higher education in the State to provide the facilities and structures which are sorely needed to accomplish the purposes of this act, all to the public benefit and good, to the extent and manner provided herein."

We find nothing in the case before us that undermines the State's legislative intent; it is therefore accorded appropriate deference.

Though three questions are posed, there is in actuality only one basic question for our determination: Is the Act legislation respecting an establishment of religion or prohibiting the free exercise thereof in contravention of the establishment clause? We think it is not.

Prior to *Lemon, Tilton, Earley* and *Robinson*, there were three significant cases decided by the Supreme Court of the United States on the point. In *Everson v. Board of Education*, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711 (1947), the Court held that a New Jersey statute providing bus transportation for school children attending Catholic schools was in the nature of general welfare legislation, and that the assistance provided was neutral in its relations with groups of religious believers and non-believers, and that the statute had a secular legislative purpose, the effect of which was to neither advance nor inhibit religion.

In *Board of Education of Central School District No. 1 v. Allen*, 392 U. S. 236, 88 S. Ct. 1923, 20 L. Ed. (2d) 1060 (1968), the Court upheld the loan of secular books to students attending parochial schools, holding: ". . . this Court has long recognized that religious schools pursue two goals, religious instruction and secular education. . . ." In determining the validity of the challenged statute, the Court utilized the secular purpose and primary effect test under which, to withstand the strictures of the establishment

clause, there must be a secular legislative purpose and a primary effect which neither advances nor inhibits religion. The statute was upheld on the ground that its stated legislative purpose clearly was secular, and the primary effect of the loan of secular textbooks could not be said either to advance or inhibit religion.

In *Abington Tp. School District v. Schempp*, 374 U. S. 203, 83 S. Ct. 1560, 10 L. Ed. (2d) 844 (1963), the Court fashioned a test for distinguishing between forbidden involvement of the State with religion and those which the establishment clause permits:

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be secular legislative purpose and a primary effect that neither advances nor inhibits religion."

On June 28, 1971, the Supreme Court of the United States decided the four cases referred to hereinabove. In *Earley* and *Robinson,* citizens and taxpayers of Rhode Island brought suit against state officials to enjoin, as repugnant to the religion clauses of the first amendment and the due process clause of the fourteenth amendment, the operation of a Rhode Island statute providing for payment of up to 15% annual salary supplements to teachers of secular subjects in non-public elementary schools.

In *Lemon,* a similar action against State officials was instituted by Pennsylvania residents and taxpayers challenging the constitutionality of a statute which provided for State reimbursement of non-public elementary and secondary schools for costs of teachers' salaries, textbooks and instructional materials in specified secular subjects, but prohibiting reimbursement for any course that contained any

subject matter expressing religious teaching or the morals or forms of worship of any sect.

The Court held that both the Rhode Island and Pennsylvania statutes were unconstitutional under the religion clauses of the first amendment, as fostering, by their cumulative impact, excessive entanglement between government and religion. In so holding the Court considered:

(1) the religious purpose and operation of church related elementary and secondary schools, (2) the enhancement of the process of religious indoctrination resulting from the impressionable age of the pupils, particularly in elementary schools, (3) the necessity of state surveillance to insure that the teachers, who were subject to control by religious organizations, observed the restrictions as to purely secular instruction, (4) the states' examination of the parochial schools' financial records to determine which expenditures were religious and which were secular, (5) the probable intensification of political divisiveness along religious lines resulting from the annual appropriations required under the statutes, benefiting relatively few religious groups, and (6) the self-perpetuating and self-expanding propensities of the innovative statutory programs.

We think our case easily distinguishable from these three cases. Under the Rhode Island statute, in order to receive the 15% supplement, teachers were required to be employed in a non-public school at which the average per-pupil expenditure on secular education was less than the public school average. Schools' financial records were subjected to audit by the State. The teacher was required to teach only those subjects offered in the public schools, using teaching materials used in the public schools. Upon applying for the salary supplement the teacher was required to agree in writing not to teach a course in religion while receiving salary supplements. Only teachers in Catholic schools applied.

Under the Pennsylvania statute, participating schools were required to maintain prescribed accounting procedures

to identify the cost of secular education services; the accounts were subjected to State audit; reimbursement was limited to courses presented in the public school curricula; and textbooks and materials were subjected to approval by the State.

In the light of the cumulative impact of such plans, the Court held:

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church."

In discussing the Pennsylvania statute the Court said:

"As we noted earlier, the very restrictions and surveillance necessary to ensure that teachers play a strictly non-ideological role give rise to entanglements between church and state. The Pennsylvania statute, like that of Rhode Island, fosters this kind of relationship."

The surveillance on the part of the State, obviously abhorred by the Court, is not necessary under the proposed financing plan of the college. The Court contemplates execution of a contract which definitely establishes the rights of all parties to the agreement. The State plays a passive and very limited role in the implementation of the Act, serving principally as a mere conduit through which institutions may borrow funds for the purposes of the Act on a tax-free basis. There is in no sense a banking rleationship between the Authority and institutions which utilize the Act. The plan of financing is patterned closely after that successfully functioning under the South Carolina Industrial Revenue Bond Act approved by this Court in *Elliott v. McNair*, 250 S. C. 75, 156 S. E. (2d) 421 (1967). The Authority would

take title to the property by deed, issue revenue bonds to finance the project, mortgage the project property to a trustee bank, lease the project back to the College, and simultaneously assign all of the Authority's rights under the lease to the trustee in order to provide for the payment of the bonds. The trustee would disburse them on the order of the institution (subject to proper safeguards assuring a proper application of the proceeds to the purpose for which the bonds were issued) so that upon delivery of the bonds the interest of the Authority would, for all practical purposes, cease.

Counsel for plaintiff argues that the broad language of the Act causes the State, of necessity, to become excessively involved in the operation, management and administration of the College. We do not so construe the Act. A reading of the Act and the proposal of the College as submitted to the Authority by petition for approval, indicates that the basic function of the Authority is to see that religion is not promoted on the leased premises, and that fees are charged sufficient to meet the bond payments. The decisions recognize that some involvement between church and State is not constitutionally obnoxious. It is a question of degree and each case must be judicially determined on its own facts, taking into consideration all of the relevant factors.

When one considers the character and purpose of the College and the nature of the assistance provided, and the resulting relationship between the government and the College, it necessarily follows that there is less potential for experiencing the substantive evils which the religious clauses were intended to protect than in *Tilton*.

*Tilton* also related to the establishment clause of the Constitution of the United States, but arose on a different factual basis. Taxpayers and residents of Connecticut challenged the constitutionality of the Higher Educational Facilities Act of 1963, alleging that it violated the first amendment. That Act authorized federal grants to institutions of

higher education for construction of academic facilities, *except those to be used for sectarian instruction or worship,* or in connection with the program of a divinity school or department. Under the Act the government would retain only a 20-year interest in the financed facilities, and if a facility should be used other than as a secular academic facility during such period, the United States government would be entitled to recover back a proportionate part of the federal grant. Five members of the Court agreed that the religion clause of the first amendment was not violated by the Act insofar as it authorized grants to church-related colleges for construction of buildings and facilities to be used exclusively for secular educational purposes. Eight members of the Court agreed that the first amendment was violated by the act's provision limiting the government's interest in covered facilities to a 20-year period. The Court found constitutionally objectionable only the 20-year provision which allowed use of the facilities for sectarian purposes after that period. The Court said:

"Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20-year provision on any contrary conclusion. If, at the end of 20 years the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.

"To this extent the Act therefore trespasses on the Religion Clauses. . . ."

We think the facts in *Tilton* are greatly similar to the facts in this case, but the 20-year limitation involved in *Tilton* is absent in the case before us. As pointed out hereinabove, facilities used or to be used for sectarian instruc-

tion or as a place of worship are excluded under the Act. In addition, the rules issued by the Authority specifically provide that the properties conveyed, and later re-conveyed, may not be used for sectarian instruction or as a place of worship, and provide that when the property is deeded back to the college the deed shall contain a restriction that the premises and facilities shall not be used for sectarian instruction or a place of worship or in connection with a program of a school of divinity. Accordingly, we find and conclude that the objection sustained in *Tilton* is not present here.

From a study of the whole of the record, including the Act itself, we conclude that the Act is a valid exercise of the legislative power of the General Assembly of South Carolina. It has a secular legislative purpose. It neither advances nor inhibits religion. There is no fostering of an excessive government entanglement with religion.

We have considered all issues in the light of *Lemon, Robinson, Earley* and *Tilton,* and conclude that the relief sought by the plaintiff must be denied. The establishment clause of neither the United States Constitution nor the Constitution of South Carolina is violated. The defendants constituting the Budget and Control Board, and the defendant, Baptist College at Charleston, may proceed with the proposed issuance of revenue bonds pursuant to the Act.

The judgment of the lower court is

Affirmed.