14625

THOMAS v. MACKLEN *ET AL.*

(195 S. E., 539)

August, 1937.

*Messrs. Thomas, Lumpkin & Cain* and *L. D. Lide,* for appellant,

*Messrs. Lonnie D. Causey, E. J. Sherwood* and *C. B. Thomas,* for respondents,

March 2, 1938.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This appeal brings up for review the constitutionality of an Act of the General Assembly, approved on April 23, 1937, providing for a plan whereby so-called "resort communities" within the bounds of the State may be incorporated as municipal corporations. Acts 1937, p. 309.

Inasmuch as the questions presented deal solely with the unique provisions of this Act, which the respondents assert is antagonistic to various provisions of the Constitution of

this State, and to which frequent reference must be made, we deem it desirable to quote it somewhat fully.

It is entitled, "An Act to Provide for the Creation of Municipal Corporations at Resort Communities in South Carolina."

"Section 1. * * * That the term 'resort community' as hereinafter used is defined as an area of not less than one square mile, devoted primarily to resort purposes, having a population of not less than three hundred inhabitants, and as to which area the non-resident freeholders shall exceed in number the resident electors and no part of which area shall be included within the limits of a regularly incorporated municipality.

" 'Non-resident freeholders' is defined as one having legal residence within the resort community but within the State and vested with title to real estate within the resort community."

Section 2 provides for the filing of a petition with the Secretary of State, which shall conform to the requirements of Section 1, and the issuance of a commission by the Secretary of State, empowering the commissioners to procure the registration of electors, within the proposed corporate limits, and to advertise an election to determine whether incorporation will be accepted under the Act.

Section 3 provides for the advertisement of the election.

"§ 4. * * * At the election referred to in Section 2, non-resident freeholders who are qualified electors at their places of residence shall be entitled to vote, upon their production of proof that they are qualified to vote at their places of residence. Non-resident freeholders shall be privileged, if they desire, to file with the managers of election the proof of their qualification in advance of the election and to vote in said election in the manner in which absentee voting is permitted by law in primary elections insofar as the same may be applicable. The commissioners are charged with the duty of making all necessary provisions for furnishing such ballots as may be requested by those so desiring

to vote and making all necessary arrangements to receive and tabulate such votes. The managers of elections shall tabulate and report separately the result of the votes cast by resident electors and non-resident freeholders."

Section 5 provides for a return to be made of the election to the Secretary of State by the commissioners.

Section 6 provides that the name of the municipality shall be that name which received the highest number of votes cast at the election.

"§ 7. * * * If the election is favorable to incorporation, as soon as practicable after the return has been filed with the Secretary of State, the Governor, by and with the advise and consent of the Senate, shall appoint five (5) persons, three (3) of whom shall be registered electors within the area and two (2) of whom shall be non-resident freeholders thereof, which persons shall be known as the Town or City Council. From those so appointed, one shall be chosen by the appointees as mayor. Upon the appointment of the town or city council and the subsequent choice of mayor, the Secretary of State shall issue a certificate of incorporation of said town under this Act, whereupon it shall have all the powers, privileges and immunities and be subject to all the liabilities and limitations of towns and cities having a similar resident population, except as in this Act provided. The three registered electors to be appointed as aforesaid may be nominated in a primary held in accordance with the law relating to primary elections, and such nomination shall be deemed a recommendation to the Governor; and this provision shall be applicable to the successors of such initial appointees.

"§ 8. * * * The initial appointments by the Governor shall be, as to registered electors, for terms of one, three and five years, respectively, and as to non-resident freeholders, for terms of two and four years, respectively. Thereafter, the term of each member of the council shall be for a period of five years and until his successor is appointed and qualified. The term of mayor, as mayor, shall

be for one year. Appointments shall be made so as to preserve the proportionate representation of resident electors to non-resident freeholders as above indicated. In case vacancy shall occur by death, resignation, removal from office, disqualification or otherwise, appointment to fill the unexpired term shall be made by the Governor, by and with the advice and consent of the Senate, the appointee designated between sessions of the General Assembly to serve as de facto officer until such time as the appointment shall be confirmed or rejected.

"§ 9.  *  *  *  The provisions for absentee voting as set forth above shall apply at any and all general or special elections held by the municipality.

"§ 10.  *  *  *  The sections and provisions of this Act are separable and are not matters of mutual essential inducement, and it is intended to confer the whole or any part of the powers herein provided for, and if any of the sections or provisions or parts thereof are for any reason illegal, it is intended that the remaining sections and provisions or parts thereof, shall remain in full force and effect. In the event, but only in the event, of judicial determination that the provisions herein made for representation of non-resident freeholders upon the town or city council is illegal, then all of the members of said Council shall be appointed as above provided from registered electors within the area.

"§ 11.  All Acts or parts of Acts inconsistent herewith are hereby repealed to the extent of such inconsistency.

"§ 12.  This Act shall take effect immediately upon its approval by the Governor."

Under the provisions of this Act, an election was held, looking toward the incorporation of an area known as Myrtle Beach, situated on the Atlantic coast of South Carolina. At this election, participated in by nonresident freeholders and by local registered electors, the proposed incorporation was defeated. Thereafter, upon petition duly filed with the Secretary of State, a commission was issued to the

first named defendants herein, looking toward the incorporation of Myrtle Beach under the general municipal incorporation laws of the State, and to this end an election was advertised to be held on August 25, 1937.

Before this election could be held, however, the plaintiff, a nonresident freeholder of Myrtle Beach, brought this action for the purpose of enjoining the defendants from taking any further steps thereabout, upon the ground that Myrtle Beach is such a "resort community" as comes within the meaning and intent of Section 1 of the Act, it being argued: That the Act which we have quoted supersedes and repeals the general municipal incorporation law of South Carolina insofar as "resort communities" are concerned, and that such communities as come within the definition of Section 1 must incorporate under the Act, or not incorporate at all.

Upon the verified complaint of the plaintiff, his Honor, Judge P. H. Stoll, issued a rule requiring the defendants to show cause why they should not be enjoined from proceeding with the incorporation and organization of Myrtle Beach under the general law, and copies of this order, together with copies of the complaint, were duly served upon the defendants. The defendant W. P. Blackwell, as Secretary of State, filed a formal return. The other named defendants filed a return, raising the constitutional questions which form the subject of this appeal.

The matter was heard by Judge Stoll on August 23, 1937, at which time he adjudged the returns of the defendants sufficient, declared the Act unconstitutional in its entirety, and refused the restraining order. From his decree the plaintiff appeals to this Court.

The facts in our opinion show that Myrtle Beach comes within the provisions of the Act, in that there are, apparently, 401 nonresident South Carolina freeholders who own property within the area sought to be incorporated, as against 178 local registered electors whose names appeared on the registration book when the books were closed prior to the

first election herein referred to—thus showing a clear numerical preponderance in favor of the nonresident freeholders.

It likewise appears that the local resident population of Myrtle Beach, within the area proposed to be incorporated, numbers more than 1000.

The lower Court, among other things, held Sections 4, 7, and 8 of the Act unconstitutional, insofar as they confer upon nonresident freeholders of the proposed incorporated town, the right to vote and to hold office therein. Able counsel for the appellant frankly concede the correctness of this holding, but they insist that the remainder of the Act is nevertheless a complete legislative enactment, and direct attention to Section 10, where provision is made for the appointment by the Governor of all of the members of council from the registered electors within the area, in the event of judicial determination that the provision made for representation of nonresident freeholders is illegal. If these were the only portions of the act repugnant to the Constitution, we would agree with counsel.

That those sections of the Act referred to, insofar as they give the right to nonresident freeholders to vote and to hold office, are unconstitutional, cannot be questioned for a minute. They may be given short shrift by a mere reference to the following sections of the Constitution: Article 8, §§ 1 and 2; Article 2, §§ 2, 4, and 12.

We will now consider the question whether the classification sought to be established by Section 1 of the Act is violative of pertinent constitutional provisions.

The lower Court held: "When the Act is stripped of these two provisions (the right of nonresidents to vote and to hold office), the only unusual feature of the Act remaining is the provision that the Governor must appoint members of town council. This provision appears to be unreasonable and arbitrary, deprives the local citizens of the right of self government enjoyed by citizens of other towns and cities, and I can find no reasonable relation between this feature

of the Act and the classification sought to be established under Section 1 of the Act. In other words, if there is a sound and reasonable. need for the classification such as would be established under Section 1 of the Act, then this need should be reflected in some provision of the Act more substantially different from the general law than the mere appointive power given to the Governor, for this is all of the Act left when it is stripped of its clearly unconstitutional parts."

By Article 3, § 34, it is provided that the General Assembly of this State shall not enact local or special laws concerning any of the following subjects, or for any of the following purposes, to wit: Here follow eight enumerated subjects prohibited by the Constitution, among them: Subdivision 2, "To incorporate cities, towns or villages, or change, amend or extend charter thereof." Subdivision 9, "In all other cases, where a general law can be made applicable, no special law shall be enacted." Subdivision 10, "The General Assembly shall forthwith enact general laws concerning said subjects for said purposes, which shall be uniform in their operations: Provided, That nothing contained in this section shall prohibit the General Assembly from enacting special provisions in general laws."

The purpose of these constitutional provisions, and the evils intended to be remedied by them, have been repeatedly declared and pointed out in the decisions of this Court. To arrest, and for the future prevent, the evils referred to, the provisions in question were inserted in the present Constitution. In *State v. Hammond,* 66 S. C., 219, 44 S. E., 797, 799, it was said that the object of Section 34, Article 3, "was to place a *limitation* upon the power of the Legislature. The evil sought to be remedied was the great and growing evil of special and local legislation. To remedy this evil, such legislation was *absolutely* prohibited as to certain enumerated subjects, and *conditionally* prohibited as to all other subjects. In considering the effect of a constitutional limitation, it must be borne in mind that the legislative will is unlimited, unless there is in the Constitution some express or necessarily

implied restriction. If the intention is not to limit the power of the Legislature, all that is necessary is for the Constitution to be silent. It must be assumed that the framers of the Constitution knew this. What, then, was the purpose of the clause under consideration? Was it to limit or restrict legislative power, or was it intended as a mere rule of caution, or as mere matter of moral persuasion? The fact that it was placed at all in the Constitution, and in such prohibitive terms, shows that it was intended as a restriction upon legislative power, and the express declaration in Article 1, § 29, 'that the provisions of the Constitution shall be construed to be mandatory and prohibitory and not merely directory, except where expressly made directory or permissory by its own terms,' forbids a construction which would reduce the provision to a mere matter of legislative discretion. If the provision is a limitation upon legislative power, then under our form of government, the power must lie somewhere to enforce such limitation, and there can be but one answer to the question as to where lies the power—in the judicial department."

Whether a statute be a law of a general nature or not, depends, it must be conceded, upon its subject-matter, and not upon its form; and hence, to come within this constitutional inhibition, it is not necessary that the statute be general in form. Nor can it be maintained that because the act is local in form it must be presumed that there was some sufficient local necessity for its enactment; for this would totally defeat the provisions of the Constitution. If it must be assumed, merely because the statute has been enacted, that the Legislature had information showing that there was a necessity for such legislation with reference to the particular locality, it would follow that all legislation local in form must be upheld, however general the nature and subject-matter of such legislation might be. Such a rule of construction would be contrary to the mandatory character of the constitutional provisions we are considering.

The statute in question purports to be general, applying

to the incorporation of all so-called "resort communities" of a designated class. The subject of the statute is the machinery of government—the appointment of the council in such proposed municipal corporation. It enacts for Myrtle Beach (because the Act with its meticulous restrictions might as well have named Myrtle Beach, as possibly one other seaside community) a permanent and comprehensive system of municipal government not only essentially different from that established for the remainder of the State by the general statutes, but directly at variance with it. It would appear to be the experiment of a new scheme seemingly, general in its nature, but local in its application. That the present Act is expressed in general terms is not, and should not be, decisive of the question of its constitutionality. That is a question which must be decided, not by the letter, but by the spirit and practical operation of the Act. There is, of course, the difficulty of laying down any general rule by which the question of whether a law is local or general may be solved.

The New York Court of Appeals, in the case of *In re Henneberger*, 155 N. Y., 420, 50 N. E., 61, 62, 42 L. R. A., 132, had this to say in discussing an Act of similar import where this question arose: "Although this Act is drawn in general terms, if its provisions are such in number and in character as unduly, with reference to the constitutional purpose, to restrict its operation, and, to all intents, to confine it to a particular locality, then, I think, it comes as much under condemnation as though it designated the locality by name. While an Act might be general, if it affected all towns of a class, and that class was based on population, or some other condition, which might be recognized as possibly common to a class, or which might permit of classification, if it contain such added limitations as to restrict its operation to what must always be, in the nature of the case, a very limited number of specified localities, if not, in fact, one, then it is local within the constitutional sense."

And the conclusion was reached in that case that the Act

was a mere device to evade a wholesome constitutional provision, so transparent as to be clear to the most ordinary intelligence, and it was held that "enumeration of restrictions upon the application of the Act has reached a point where it ceases to be classification, and * * * serves the purpose of identification."

Clearly, if the Act is a device to give what is in substance a local or special law the form of a general law, the legislative purpose runs counter to the constitutional prohibition.

It was held in *Re Elm St., in New York City,* 246 N. Y., 72, 78, 158 N. E., 24, 26: "If the class in its formation is so unnatural and wayward that only by the rarest coincidence can the range of its extension include more than one locality, and at best but two or three, the Act so hedged and circumscribed is local in effect. If the same limits are apparent upon the face of the Act, unaided by extrinsic evidence, or are so notorious or obvious as to be the subject of judicial notice, it is also local in its terms."

In the case at bar, the broad ground upon which the Court is asked to declare this feature of the Act unconstitutional is that, under the specious guise of classification, it is local and special legislation pure and simple, without pretense of necessity, and opens wide the door for other legislation of the same obnoxious and inhibitive character.

That the classification attempted in Section 1 of the Act runs counter to the constitutional provision prohibiting special legislation, we think, is inescapable. One of the manifest objects of that instrument was to eradicate that species of legislation and substitute, in lieu of it, general laws whenever it was possible to do so.

The authorities are agreed that a law general in form, but special in its operation, violates a constitutional inhibition of special legislation as much as though special in form; and they are also agreed that, for the purpose of applying different rules to different subjects, the Legislature cannot adopt a mere arbitrary classification. The classification here attempted is purely arbitrary. As was

said by the Supreme Court of Missouri (*State ex rel. v. Miller,* 100 Mo., 439, 13 S. W., 677, 679), in discussing tests to distinguish general from special or local law: "There must be some distinguishing peculiarity which gives rise to the necessity for the law as to the designated class. A mere classification for the purpose of legislation, without regard to such necessity, is simply special legislation of the most pernicious character, and is condemned by the constitution. Mere differences, which would serve for a basis of classification for some purposes, amount to nothing in a classification for legislative purposes, unless such differences are of such a character as, in the nature of things, to call for and demand separate laws and regulations."

"Judicial decisions uniformly declare that the classification of cities and towns must be based on a rational difference of situation or condition found in the municipalities placed in the different classes (*Northwestern University v. Wilmette,* 230 Ill., 80, 87, 82 N. E., 615); that the basis of classification must have some reasonable relation to the purposes and objects to be attained by the legislation and in some rational degree account for the various provisions of the enactment." McQuillin, Municipal Corporations, Vol. 1, § 220.

The New Jersey Supreme Court had a similar question under consideration in *Board of Tenement House Supervision v. Mittleman,* 104 N. J. L., 486, 141 A., 571, 573, from which we quote:

"In the case of *Clark v. Cape May,* 50 N. J. L., 558, 14 A., 581, the question was as to the legality of the discharge of a member of the police force of the City of Cape May under the provisions of an Act which contained the proviso that it 'shall not apply in and to cities commonly known as seaside and summer resorts.' Mr. Justice Scudder, who delivered the opinion of the Court holding the Act special and unconstitutional, said:

" 'They cannot be removed by force of this statute for any reason other than the causes for removal specified in

that Act, and certainly cannot be discharged without any cause, unless in some way the council are freed from the restraining power of the Act. Is, then, the exemption contained in this amended section constitutional in its classification of cities commonly known as seaside and summer resorts in its relation to the removal of members of the police department? This can be answered by applying the test which was briefly put in *Anderson v. Trenton,* 13 Vroom [42 N. J. L., 486, 488]. Is the basis of classification some peculiar feature to which the provisions of the law are naturally related? The peculiar feature in this case is that the cities are seaside resorts, the provisions of the law apply to policemen, and the point to be established is the relation between them that makes the classification natural and appropriate. There is nothing in the mere location of these cities by the seaside that makes a more absolute control of their policemen necessary than in other cases; nor are they less liable than others to be controlled by political reasons, or unworthy motives, which are prohibited in the Act. The only peculiar feature that has been presented to us, or can be conceived, is, that in the summer months there is a large and constantly changing population composed of those who go to this city for business, health or recreation, and there is more need for protection and watchfulness at that season than in ordinary cities. It appears in this case that in the summer and early fall months, while this travel continued, the council employed usually six policemen, while at other parts of the year but three were engaged. It happens in other cities that there are large meetings, parades and crowds of people that are peaceful; and sometimes there are disturbances that threaten breaches of the public peace, which make it necessary that there should be temporary appointments of special officers, in addition to the regular police force, to preserve order. The difference between the two cases is, that here the crowd goes to the seaside at a stated time every year, while in other cases it happens occasionally. It does not appear that this is a sufficient distinction to base upon it

the classification and exception to the general law appertaining to cities and their police departments. If the necessity of appointing two or three more policemen than would be otherwise needed is to be construed as a sufficient cause for annulling this statute, which was passed to correct the great abuses that were known to exist in our cities before its enactment, in the removal of faithful and capable men from office, then there is little protection given by it. The exception, if allowed, will be followed by others, hardly distinguishable, and the evasion of this statute will soon be completed, or the legislature be driven to repeal it.'

"To the same effect are the cases of *Freeholders of Hudson County v. Buck,* 51 N. J. L., 155, 16 A., 698; *Wanser v. Hoos,* 60 N. J. L., 482, 38 A., 449, 64 Am. St. Rep., 600; *Foley v. Hoboken,* 61 N. J. L., 478, 38 A., 833; *Oliver v. Burlington,* 75 N. J. L., 227, 67 A., 43."

Now, what are the provisions of the Act in the case at bar, which make the basis of classification relate to some peculiar feature to which the provisions of the law are naturally related? The peculiar feature relates to what is designated as a "resort community," defined as follows, Section 1:

(a) It must contain an area of not less than one square mile,

(b) Must be devoted primarily to resort purposes,

(c) Must have a population of not less than 300 inhabitants,

(d) And as to which area the nonresident freeholders shall exceed in number the resident electors,

(e) No part of which area shall be included within the limits of a regularly incorporated municipality.

"Nonresident freeholder" is defined as one having legal residence without the resort community, but within the State, and vested with title to real estate within the resort community.

The subsequent provisions of the law apply wholly and exclusively to the method of selecting the town council of such proposed municipality. Is there any reasonable relation

between these two things, to wit, a "resort community," and the selection of the town council, which makes the classification natural, germane, and appropriate? We think not. It is argued in the able brief of appellant's counsel that the undoubted purpose of the General Assembly was to provide a method of choosing the very best men from the local registered electors and from the nonresident freeholders, as the governing board for such town. We agree with the Circuit Judge, and with the reasoning employed by the New Jersey Supreme Court in *Board of Tenement House Supervision v. Mittleman, supra,* that this furnishes no sufficient distinction upon which to base the classification and exclude the general law pertaining to cities and towns and their municipal government. If this classification could be sustained, then the constitutional requirements which we have quoted and referred to, would be of no avail, as there are few objects or characteristics which cannot be arbitrarily associated, if all that is requisite for the purpose of legislation is to designate them by some quality or local status, no matter what they may be, which will so distinguish them as to mark them as a distinct class. The marks of distinction upon which the classification is founded must be such, in the nature of things, as will, in some reasonable degree at least, account for or justify the restriction of the legislation.

We are unable to perceive any rational difference of situation or condition to be found in what is called a "resort community" from that of any municipal corporation organized under the general law in relation to the selection of its town council. There is nothing in the Act which in any rational degree can justify this attempted classification. In our opinion, it bears no reasonable relation to the object sought to be accomplished under and by the Act. See *Hammer v. State,* 44 N. J. L., 667; *State v. Trenton,* 42 N. J. L., 486. The section in question may be a general law in form, but Courts of Justice cannot permit constitutional prohibitions to be evaded by dressing up special laws in the garb and guise of general statutes. It re-

quires no great degree of perspicacity to descry, in the carefully drawn provisions of this Act, the obvious intention to limit its application to the seaside resorts of the State. Furthermore, it is too plain for argument that the practical effect of the operation of the law will introduce radical diversity into the governmental structure of our municipal corporations. In declaring this feature of the Act unconstitutional, we are not unmindful that it is a grave matter to overturn, by judicial construction, an enactment of the General Assembly. All presumptions are in favor of the power of that body to enact the law. All considerations involving the wisdom, the policy, or the expediency of the Act are addressed exclusively to that branch of the State government. Its power to enact the law is the sole question addressed to this Court. So long as doubts concerning this power remain, it is our plain duty to resolve them in favor of the validity of the Act. But when the unconstitutionality of an Act is clear to this Court, beyond a reasonable doubt, then it is its plain duty to say so.

The appellant maintains that unless the Act as a whole is declared unconstitutional, it should be allowed to stand, and the general law insofar as it affects resort communities should be held to be repealed. This argument is in keeping with the plaintiff's contention that Myrtle Beach must be incorporated under this Act or not at all, because this Act, in Section 11, repeals all Acts inconsistent therewith. When Section 1 is struck down, then obviously the remaining provisions of the Act necessarily become inoperative. When a tree is severed at the trunk its limbs do not remain aloft.

In our opinion, the provisions of the Act relative to the method provided for the appointment of the town council must stand or fall with Section 1, which provides for the classification of "resort communities." To hold that the one could stand and the other fall would do violence to any rational theory of statutory construction. And for the same reason, Section 11 of the Act, which repeals all inconsistent Acts, must fall with the other provisions.

In our opinion the Act is unconstitutional for the reasons assigned, and is invalid in its entirety, because, as we have construed it, its provisions are inseparable.

Judgment affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. BONHAM and BAKER concur.

MR. JUSTICE CARTER did not participate on account of illness.