20004

John W. CASEY, Individually and in behalf of all others similarly situated, Respondent, v. SOUTH CAROLINA STATE HOUSING AUTHORITY et al., Appellants.

(215 S. E. (2d) 184)

*Daniel R. McLeod, Atty. Gen.,* and *Karen L. Henderson, Asst. Atty. Gen.,* of Columbia, *for Appellant, State Budget*

304

and Control Board and Appellant Daniel R. McLeod, as Attorney General,

*Messrs. Sinkler, Gibbs, Simons & Guerard,* of Charleston, for *Appellant, South Carolina State Housing Authority,*

*Messrs. Frank K. Sloan* and *Robert C. Elliott,* of Colum-
bia, *for Respondent,*

May 2, 1975.

LITTLEJOHN, Justice:

This action was brought pursuant to the Uniform Declaratory Judgment Act, Section 10-2001 *et seq.*, Code of Laws of South Carolina (1962), to contest the constitutionality of Act No. 1171 of 1974 (the Act).

The Act empowers the South Carolina State Housing Authority (created by Act No. 500 of the Acts of 1971) to issue its notes, or bonds, to promote housing accommodations for persons of moderate to low income.

The respondent, Casey, brings the action as a citizen, resident, and taxpayer of South Carolina, for himself and all others who would be adversely affected by the action which the defendants propose to take pursuant to the Act. Parties defendant (now appellants) are the South Carolina State Housing Authority and members of the State Budget and Control Board, who would implement and coordinate the provisions of the Act. The Attorney General (also an appellant) was joined as a defendant pursuant to § 10-2008, by reason of the fact that this action seeks to declare an Act of the General Assembly unconstitutional.

The complaint alleges that the Act is unconstitutional on several grounds. The lower court held that it was violative of Article 10, § 6 of the Constitution of South Carolina, in that the Act authorized the defendants to pledge and lend the credit of the State of South Carolina for the benefit of private corporations and individuals. The lower court found the other grounds, attacking the constitutionality of the Act, without merit.

The pertinent part of Article 10, § 6 of the Constitution provides, as follows:

"The credit of the State shall not be pledged or loaned for the benefit of any individual, company, association or corporation . . ."

The Act is a complex one. After finding that there exists in South Carolina a serious shortage of sanitary and safe residential houses, it proceeds to declare that it is necessary in the public interest that the Authority be authorized to:

"(i) provide construction and mortage loans; (ii) purchase mortgage loans; (iii) provide for predevelopment costs, temporary financing and land development expenses; (iv) provide residential housing construction and rehabilitation by private enterprise and housing sponsors for sale or rental to persons and families of moderate to low income; (v) provide mortgage financing; (vi) make loans to mortgage lenders under terms and conditions requiring the proceeds thereof to be used by such mortgage lenders for new residential mortgage loans; (vii) provide technical, consultative and project assistance services to housing sponsors; (viii) assist in coordinating federal, State, regional and local public and private efforts and resources; (ix) promote wise usage of land and other resources; (x) make direct loans to qualified individuals through mortgage lenders; (xi) where necessary acquire title to real property and cause to be constructed by private enterprise or housing sponsors thereon residential housing for persons and families of moderate to low income; and (xii) sell and dispose of real property and residential housing on such terms and conditions as the authority shall determine, in order to preserve the quality of life in South Carolina."

The Act then proceeds to endow the Authority with the power to do those things enumerated, declaring that all of these things are public purposes and in the public interest.

In order to accomplish the purposes of the Act, there are provided three methods of permanent mortgage financing.

## LOAN TO LENDER PROGRAM
### (Authorized by § 5(1) (a) )

Under this program the Authority may borrow money by issuing bonds, and lend the proceeds thereof to mortgage lending institutions which are actively engaged in the busi-

ness of making mortgage loans on residential houses. The money borrowed from the Authority by the mortgage lender would be loaned by the mortgage lender to persons of moderate to low income to be chosen by the mortgage lender within specific guidelines to be established by the Authority. Bonds issued by the Authority under this first program would be secured by a pledge of the revenues received by the Authority in repayment of the loans made to the mortgage lenders, and by the collateral pledged by the mortgage lenders. Bonds issued by the Authority under this plan would not be secured by the "Guaranty Fund," established by the Act, to which reference will be made hereafter.

## DIRECT MORTGAGE LOAN PROGRAM
### (Authorized by § 5(1) (b) )

Under this program the Authority would borrow money by issuing bonds, and use the proceeds to finance the construction of residential housing units by private builders. The Authority would then make such housing available to persons of moderate to low income. The Authority would appoint private mortgage lenders to service the loans made to members of the moderate to low income class. The bonds issued by this program would be secured by a pledge of the revenues received by the Authority on repayment of the mortgage loans made by the Authority. In addition, the bonds would be secured by the pledge of the "Guaranty Fund," to which reference will be made hereafter.

## MORTGAGE PURCHASE PROGRAM
### (Authorized by § 5(1) (c) )

This program authorizes the Authority to borrow money by issuing notes with a maturity not exceeding two years, the proceeds of which would be used to purchase federally-insured mortgages from mortgage lenders upon the agreement of such mortgage lenders to use the proceeds of the purchase price in originating mortgage loans to persons or

families of moderate to low income. The notes of the Authority would be secured by a pledge of the federally-insured mortgages so purchased, and would be refunded by the proceeds of bonds directly secured by the "Guaranty Fund," to which reference will be made hereafter.

There is also provided one temporary method of mortgage financing.

## DIRECT CONSTRUCTION LOAN PROGRAM
### (Authorized by § 5(1) (a) )

This program permits the Authority to made direct, insured loans to housing sponsors from the proceeds of its bonds where there is a commitment for permanent financing through a federal, or federally-insured mortgage. This program does not pledge the "Guaranty Fund," to which reference will be made hereafter.

## THE GUARANTY FUND

The Guaranty Fund is created by, and may be utilized by and paid out in accordance with § 6 of the Act, which reads in pertinent part as follows:

"Any unexpended balance in the State General Fund at the end of fiscal year 1973-74 in excess of the amount required to cover appropriations in the State General Appropriations Act for 1974-75, as determined by the State Budget and Control Board in accordance with the provisions of Section 1-782 of the 1962 Code, but not in excess of ten million dollars, shall be set aside in a special account in the State Treasury to constitute a Guaranty Fund for any State bonds that may thereafter be issued by the South Carolina State Housing Authority. All monies in the Guaranty Fund shall be held by the State Treasurer, and shall be used only for the purpose of paying principal (whether at state maturity, or in accordance with any mandatory sinking fund) of and interest on notes and bonds issued pursuant to Section 5(1)

(b) of this act in the event funds otherwise intended therefor shall be insufficient to meet the principal of and interest on such notes and bonds as and when the same become due and payable. . . .

"In the event that funds intended to pay the interest on or principal of any notes or bonds of the authority issued pursuant to Section 5(1) (b) are not available for that purpose, it shall be the duty of the State Treasurer to forthwith utilize the Guaranty Fund to the extent required to meet any such deficiency. The duty herein imposed upon the State Treasurer is declared to be mandatory and obligatory and enforceable by any holder of any note or bond of the authority issued pursuant to Section 5(1) (b) in any court of competent jurisdiction. . . ."

## GUARANTY FUND REQUIREMENT

Section 7 of the Act establishes the Guaranty Fund Requirement in language as follows:

"Notes and bonds may be issued by the authority pursuant to Section 5(1) (a) of this act without regard to the Guaranty Fund limitation of this section. The Guaranty Fund shall not be pledged to secure either the interest on or principal of any notes or bonds issued pursuant to Section 5(1) (a). No notes or bonds may be issued pursuant to Section 5(1) (b) unless the Guaranty Fund limitation hereinafter set forth in this section shall be complied with. No notes or bonds shall be issued pursuant to Section 5(1) (b) unless the value of the Guaranty Fund, after taking into account any bond proceeds required to be credited thereto by a resolution authorizing the issuance of additional bonds, shall be not less than the Guaranty Fund Requirement. For purposes of this act, the Guaranty Fund Requirement shall mean the maximum amount of principal, sinking fund installment and interest becoming due in any future year on all bonds issued pursuant to Section 5(1) (b) and then outstanding including the bonds then proposed to be issued.

"In calculating the principal amount of notes and bonds of the authority then outstanding, no account shall be taken of any outstanding notes or bonds which have been refunded as to both principal and interest or are to be refunded as to both principal and interest out of the proposed series of notes or bonds."

Section 14 of the Act requires the Authority to report annually to the State Budget and Control Board the sum, if any, required to restore the Guaranty Fund to levels necessary to service bonds issued under § 5(1) (b) and requires the Budget and Control Board to include in its annual report to the General Assembly a statement showing the amount necessary to fund the deficit and restore the Guaranty Fund Requirement. In addition to making this recommendation, the Budget and Control Board must also approve the issuance of any bonds or notes issued pursuant to the Act.

Section 11 of the Act provides as follows:

"The notes, bonds, or other obligations of the authority shall not be a debt or grant or loan of credit of the State of South Carolina or any political subdivision thereof and neither the State of South Carolina nor any political subdivision thereof shall be liable thereon, nor shall they be payable out of any funds other than those of the authority and the Guaranty Fund; and all notes, bonds and other obligations issued pursuant to this act shall contain on the face thereof a statement to such effect."

The basic question which the lower court decided, and which we must now determine is: Does this Act and the plan of promoting housing so involve the credit of the State that it can be said that the credit is "pledged or loaned for the benefit of any individual, company, association or corporation?"

This Court has repeatedly held that all reasonable doubt must be resolved in favor of the constitutionality of an act. If a constitutional construction of a statute

is possible, that construction should be followed in lieu of an unconstitutional construction. We approach the question now before us in the light of this rule.

We are of the opinion that the Act commits the State of South Carolina and, by so doing, pledges its credit to make good any deficit arising because of default under both the Direct Mortgage Loan Program and the Mortgage Purchase Program. The fact that such deficit would be paid out of the Guaranty Fund, instead of the General Fund of the State, makes the obligation no less a pledge of the credit of the State. The lower court observed: "The fund, . . . is comprised purely and simply of tax revenues." When the State in effect says, "The deficit will be paid out of the Guaranty Fund," the credit of the State, and the obligation to pay, is involved just as though the State should say, "The deficit will be paid out of the General Fund, or some other fund."

Section 11, quoted hereinabove, fails to devise a method of lessening the impact of the prohibition presented by Article 10, § 6 of the Constitution. It fails to accomplish the desired end without pledging the credit and the financial backing of the State.

There can, of course, be no requirement by the legislature which created this Act that some future legislature appropriate funds to absorb a deficit reported to it by the Budget and Control Board as contemplated by § 14. A future legislature could refuse to replenish the Guaranty Fund. There is, however, on the part of the legislature always a compelling desire, if not a moral obligation, to protect the credit and the good name of the State by appropriating monies to make good deficits created by State agencies.

We have referred to the Mortgage Purchase Program and the Direct Mortgage Loan Program. We now discuss the Loan to Lender Program and the Direct Construction Loan Program, neither of which directly pledges the Guaranty Fund to the payment of any deficit. Although the Act would

not appear to pledge the Guaranty Fund, and thus the credit of the State, to programs coming under § 5(1) (a) (Loan to Lender Program and Direct Construction Loan Program), the Act goes on to say in § 10:

"*Provided,* however, that if any party of an agreement securing, directly or indirectly, the payment of the principal and interest on notes or bonds issued pursuant to Section 5(1) (a) shall default in his or its obligations under such agreement, the authority may sell bonds pursuant to Section 5(1) (b) for purposes of refunding the notes or bonds issued under Section 5(1) (a) without regard to whether the notes or bonds to be refunded mature or are subject to redemption within ten years from the date of issue of the refunding notes or bonds. . . ."

Sections 6 and 7, read independent of the rest of the Act, would appear not to commit the Guaranty Fund, but when these two sections are read in connection with § 10, it is inescapable that the credit of the State is involved and pledged for the purpose of securing the payment of notes and bonds issued pursuant to § 5(1) (a).

Appellants argue that even if it be held that those provisions relating to the Guaranty Fund are unconstitutional, the remainder of the Act is valid and should be sustained. It is the duty of the Court to sustain an Act insofar as it is valid. We conclude, however, that the three permanent programs and the one temporary program are so interdependent for their funding and repayment and so intertwined by reason of §§ 6, 7 & 10, that all programs are objectionable as violative of Article 10, § 6.

In the lower court the Act was attacked on five basic grounds. The lower court sustained the position of the contestants of the constitutionality of the Act on one ground alone, holding that four other grounds were without merit. In this appeal the respondent has reasserted those four grounds as additional sustaining grounds and has asked this Court, if it should reverse the lower court, to sustain the re-

sult reached in the lower court on one or all of the four additional grounds. Inasmuch as we sustain the lower court on the same ground that the judge announced his ruling upon, we do not reach the merits of any other contentions.

Affirmed.

Moss, C. J., and Lewis and Ness, JJ., concur.

Bussey, J., dissents.

Bussey, Justice (dissenting) :

The separation of powers clause of the Constitution requires us to uphold the constitutionality of the particular act unless its unconstitutionality clearly appears beyond all reasonable doubt. The majority opinion recognizes, but, I respectfully submit, totally fails to apply this cardinal rule of constitutional construction. With all due respect to my brethren, it seems to me that the Court more and more tends to give only lip service to this rule. In the instant case I am not at all convinced that the act is violative of Article 10, section 6 of the Constitution. At the very worst it is only arguably so, and most certainly it is not unconstitutional beyond a reasonable doubt.

Since I am deeply concerned about what I regard as a tendency to give only lip service to the cardinal rule of constitutional construction and to invade the provinces of the other branches of government, I take the liberty of restating here my views as set forth in the dissenting opinion in *Gunter v. Blanton*, 259 S. C. 436, 192 S. E. (2d) 473, as follows :

"The power vested in the judiciary to declare an act of the General Assembly unconstitutional and void is, indeed, a most delicate one to be exercised with the greatest of caution by the courts lest the judiciary itself encroach upon the legislative domain in violation of the separation of powers clause of the Constitution, which the General Assembly is here charged with violating. It is well settled that doubt as to the constitutionality of a particular act has to be resolved in favor of validity and it is only where an act is clearly unconstitu-

tional, beyond any reasonable doubt, that the judiciary may invalidate it. *McElveen v. Stokes,* 240 S. C. 1, 124 S. E. (2d) 592; *Thomas v. Macklen,* 186 S. C. 290, 195 S. E. 539; *State ex rel. Edwards v. Query,* 207 S. C. 500, 37 S. E. (2d) 241; *State ex rel. Edwards v. Osborne,* 195 S. C. 295, 11 S. E. (2d) 260.

"It is timely and appropriate, I think, to quote from the opinion of Chancellor Waties in the leading case of *Byrne's Adm'rs v. Stewart's Adm'rs,* (1812) (SC) 3 Desaus. 466:

'It is the peculiar and characteristic excellence of the free governments of America, that the legislative power is not supreme; but that it is limited and controlled by written constitutions, to which the Judges, who are sworn to defend them, are authorized to give a transcendent operation over all laws that may be made in derogation of them. This judicial check affords a security here for civil liberty, which belongs to no other governments in the world; and if the Judges will everywhere faithfully exercise it, the liberties of the American nation may be rendered perpetual. But while I assert this power in the Court, and insist on the great value of it to the community, I am not insensible of the high deference which is due to the legislative authority. It is supreme in all cases in which is not restrained by the constitution; and as it is the duty of the legislators as well as of the Judges to consult this and conform their acts to it, so it ought to be presumed that all their acts are conformable to it, unless the contrary is manifest. This confidence in the wisdom and integrity of the legislature, is necessary to ensure a due obedience to its authority; for if this is frequently questioned, it must tend to diminish that reverence for the laws which is essential to the public safety and happiness. *I am not, therefore, disposed to examine with scrupulous exactness the validity of a law. It would be unwise to do so on another account. The interference of the judicial power with legislative acts, if frequent or on dubious grounds, might occasion so great a jealousy of this power, and so general*

*a prejudice against it, as to lead to measures which might end in the total overthrow of the independence of the judiciary, and with it this best preservative of the constitution. The validity of a law ought not then, to be questioned, unless it is so obviously repugnant to the constitution, that when pointed out by the Judges, all men of sense and reflection in the community may perceive the repugnancy. By such a cautious exercise of this judicial check, no jealousy of it will be excited, the public confidence in it may be promoted, and its salutary effects be justly and fully appreciated'.* (Emphasis added.)

"The *Byrne case* has been cited numerous times by this Court as well as courts of other jurisdictions, and most of the foregoing quotation was quoted with approval and applied in *Massey v. Glenn,* 106 S. C. 53, 90 S. E. 321, an en banc decision in 1916.

"The foregoing salutary principles should constantly guard us, the judiciary, against encroaching upon the legislative domain in violation of the separation of powers clause of the Constitution."