## 20740

Saundrea J. BAUER, Individually and in behalf of all others similarly situated, Appellant, v. SOUTH CAROLINA STATE HOUSING AUTHORITY, and James B. Edwards, Grady L. Patterson, Jr., Earle E. Morris, Jr., Rembert C. Dennis and Tom G. Mangum, constituting the members of the State Budget and Control Board, and Daniel R. McLeod, as Attorney General of the State of South Carolina, Respondents.

(246 S. E. (2d) 869)

222

*Robert C. Elliott,* Columbia, *for appellant.*

*Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen. Karen Henderson,* Columbia, and *Sinkler, Gibbs & Simons,* Charleston, *for respondents.*

August 10, 1978.

RHODES, Justice.

At issue in this case is the constitutionality of Act No. 76, Acts and Joint Resolutions of 1977. This Act enlarges and further defines the powers of the South Carolina State Housing Authority, which was created by Act No. 500, Acts and

Joint Resolutions of 1971. Specifically, the Act under appeal empowers the Authority to engage in a variety of programs designed to provide affordable "sanitary and safe residential housing" for persons and families of low and low to moderate income.

The lower court upheld the constitutionality of the Act. The plaintiff-appellant challenges this determination contending that (1) the Act does not serve a public purpose, (2) it pledges the credit of the State for the benefit of private corporations and individuals in violation of the South Carolina Constitution, (3) it improperly delegates legislative authority, and (4) it violates the equal protection clauses of the Federal and State Constitutions. We affirm the lower court.

I.

The present Act represents the third attempt by the Legislature to enact constitutional legislation designed to alleviate what it has found to be a serious shortage of sanitary and safe residential housing which is affordable by certain segments of South Carolina's population.

The initial enactment, which was passed in 1974, was declared invalid by this Court in *Casey v. State Housing Authority,* 264 S. C. 303, 215 S. E. (2d) 184 (1975), on the ground that it constituted a pledge of the State's credit for the benefit of the private sector in violation of the State Constitution.

A subsequent enactment in 1975 contained a provision that all rules and regulations of the Housing Authority would be null and void unless approved by concurrent resolution of the General Assembly at the session following their promulgation. In *Reith v. S. C. State Housing Authority,* 267 S. C. 1, 225 S. E. (2d) 847 (1976), this Court held that the concurrent resolution provision, which the lower court had declared unconstitutional, was an essential inducement to the enactment of the 1975 Act and could not be severed. Thus, the enactment was declared invalid.

In addition to correcting the infirmities which resulted in the 1974 and 1975 Acts being struck down, the 1977 legislation represents refinements in the previous enactments. However, it does employ the same basic scheme found in the 1974 and 1975 Acts.

The Housing Authority is authorized to issue notes and bonds with the proceeds to be used in a variety of programs to alleviate the shortage of sanitary, safe and affordable living quarters which the Legislature found exists among certain portions of the population. Unlike the previous enactments, which had as their intended beneficiaries only persons and families of moderate to low income, the 1977 Act also includes persons and families of low income as beneficiaries. And, for the first time, a precise definition of the beneficiary classes is contained in the legislation.[1]

There are five programs authorized by the 1977 Act. They are briefly as follows:

(1) *The Loan to Lender Program.*

By Section 5(1)(a) the Authority may issue its notes or bonds, the proceeds of which will be then loaned to private mortgage lenders. Such loans will be secured by the collateral prescribed in Section 5(1)(a) and the loans to such mortgage lenders will be made upon the condition that the mortgage lenders in turn use the proceeds to make loans to persons and families of low income and persons and families of moderate to low income as defined in the 1977 Act.

---

[1] " 'Persons and families of moderate to low income' means those individuals who are members of households whose gross income falls between seventy-five percent and one hundred twenty-five percent of the 'median gross income' of all households in South Carolina as determined on the basis of the latest available statistics furnished to the authority by the Division of Research and Statistical Services of the State Budget and Control Board. Gross income shall mean income derived from any source whatsoever. An allowance for each member of the family equal to an amount for personal exemptions as defined by the South Carolina Income Tax Law, Section 65-225, shall be deducted from gross income in order to qualify a person or family as a member of the 'beneficiary class'." Section 3(p).

" 'Persons and families of low income' means those individuals who are members of households whose gross income is less than the income of those within the definition of the class 'Persons and families of moderate to low income'." Section 3(o).

(2) *The Insured Direct Loan Program.*

Under Section 5(1)(b) the Authority will issue its bonds and notes for the purpose of obtaining funds with which to make (i) construction loans secured by mortgages and (ii) permanent mortgage loans to certain housing sponsors [2] if, in each instance, there is in effect a federal or other approved program providing assistance in the repayment of such loans.

(3) *The Mortgage Purchase Program.*

Under Section 5(1)(c) the Authority will issue its bonds and notes to buy existing federally insured and other mortgages from mortgage lenders who in turn promise the Authority to use the proceeds to make new loans to persons and families of low income and of moderate to low income.

(4) *The Construction Loan Program.*

Under Section 5(1)(d) the Authority is authorized to make construction loans to housing sponsors when there is in effect a commitment for permanent financing through a federal, federally insured or other insured mortgage.

(5) *The Public Rental Project Program.*

First provided for under the present Act, this program permits the Authority to acquire, cause to be constructed, and operate public rental projects for persons and families of low income and persons and families of moderate to low income. In addition, Section 7 of the 1977 Act permits the ultimate sale of such rental projects to private housing sponsors upon the condition that the projects continue to be operated for the benefit of the beneficiary classes.

The rationale relied upon to accomplish the intended purpose of the Act is that the Authority will be able to obtain its funds at below-market interest rates with the benefit of these more favorable rates being passed on to the beneficiary classes under each of the programs.

---

[2] "Housing sponsor" is defined in Section 3(j) of the Act.

The above is a very limited summary of the Art. Other relevant provisions will be discussed below in treating the appellant's contentions.

## II.

As we approach the question of whether the 1977 Housing Authority Act passes constitutional muster, we must keep in mind several fundamental principles of law.

"Our constitution is not a grant of power, but a limitation on what, absent limitations therein, would be a plenary power in the people or their elected representatives. Accordingly, it is not sufficient for us to find that an act is offensive to what may be prevailing notions of the proper sphere for state governments. It is necessary, in order for us to strike down an act of the General Assembly to find that it offends specific provisions of the state constitution which have limited and circumscribed legislative action in that area." *Elliott v. McNair,* 250 S. C. 75, 84, 156 S. E. (2d) 421, 426 (1967); *accord, Anderson v. Baehr,* 265 S. C. 153, 217 S. E. (2d) 43 (1975), and *Duke Power Co. v. Bell,* 156 S. C. 299, 152 S. E. 865 (1930). "This Court has repeatedly held that all reasonable doubt must be resolved in favor of the constitutionality of an act. If a constitutional construction of a statute is possible, that construction should be followed in lieu of an unconstitutional construction." *Casey v. S. C. State Housing Authority, supra,* 264 S. C. at 312-3, 215 S. E. (2d) at 187.

## III.

Under her first exception, the appellant asserts that the Act does not serve a public purpose. She contends a public purpose is not effectuated because, with the exception of the Rental Program, the Act provides for private ownership of housing by persons and families of low and moderate income. She points out that, even under the Rental Program, the ultimate sale of public housing projects constructed by the Authority to private individuals is permitted. Therefore, she contends the Act works a direct benefit to private individuals and does not constitute or effectuate a public purpose. She

also asserts that many of the persons and families in the moderate to low income group would have income higher than the average for the State (see definition in Footnote 1) and that it is doubtful that they live in slum or blighted areas. Additionally, she points out that the present Act does not require the clearance or destruction of slums which apparently conflicts with her view that the only way to eliminate slums is to summarily remove the people living in them and place them in better housing facilities. In summary, the appellant not only contends that the Act has a private purpose as opposed to a public one but also challenges the findings of the Legislature and the means chosen by it to effectuate the purpose of the Act.

As stated in *Elliott v. McNair, supra,* "All legislative action must serve a public rather than a private purpose," 250 S. C. at 86, 156 S. E. (2d) at 427. "In general, a public purpose has for its objective the promotion of the public health, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division . . .." *Caldwell v. McMillan,* 224 S. C. 150, 77 S. E. (2d) 798, 201 (1953) (quoting other authority). It is a fluid concept which changes with time, place, population, economy and countless other circumstances. *Id.* It is a reflection of the changing needs of society.

Based on the above principles and prior cases decided by this Court, *Benjamin v. Darlington County Housing Authority,* 198 S. C. 79, 15 S. E. (2d) 737 (1941) and *McNulty v. Owens,* 188 S. C. 377, 199 S. E. 425 (1938), it is manifestly clear that providing safe and sanitary housing for those persons who could not otherwise obtain such housing is a valid public purpose. In sustaining a statute similar to the present Act, the New Jersey Supreme Court stated in language directly applicable to South Carolina's Housing Act that:

[I]t is elementary that the very purpose of government is to provide for the health, safety and general welfare of the people. When a particular condition arises which poses a threat to the fulfillment of that function, the government has the power to take whatever steps are necessary to check the threat subject only to applicable constitutional limitations.

The question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body. . . . In the present case, the Legislature made a determination that there was 'a critical shortage of adequate housing,' that 'a large and significant number of . . . residents have and will be subject to hardship in finding adequate, safe and sanitary housing unless new facilities are constructed,' and that 'a major cause of this housing crisis is the lack of funds available to finance housing by the private mortgage lending institutions of the State.'[3]

*New Jersey Mortgage Finance Agency v. McCrane,* 56 N. J. 414, 267 A. (2d) 24, 27 (1970) (citations omitted).

It is true that the Legislature cannot under the guise of public purpose enact a law that in its realistic operation benefits, not the enumerated public purpose, but essentially private interests. *State Ex Rel. Warren v. Nusbaum,* 59 Wis. (2d) 391, 208 N. W. (2d) 780 (1973). Or, as stated in *Anderson v. Baehr, supra,* "It is not sufficient that an undertaking bring about a remote or indirect public benefit to categorize it as a project within the sphere of 'public purpose'," 265 S. C. at 163, 217 S. E. (2d) at 48.

The appellant's principal argument is that the benefits of the 1977 Act will accrue to private individuals, primarily to the beneficiary class in the form of privately owned homes. This is true and, in fact, Section 1 of the Act specifically provides that, within the parameters of the enactment, emphasis should be given to individual ownership of homes.

---

[3] The S. C. Housing Act is prefaced by findings substantially in accord with those herein set forth.

However, the mere fact that benefits will accrue to private individuals or entities does not destroy public purpose. *Elliott v. McNair, supra; Anderson v. Baehr, supra.* As the Court in *Warren v. Nusbaum, supra,* stated, "[W]hatever benefit is derived by private individuals and specific localities is necessary and incidental to the promotion of public health, safety, education, morals, welfare, and comfort of the people of this state. The advantage to the public of increasing the supply of adequate housing and eliminating the by-products of substandard housing is direct and not indirect or remote." 208 N. W. (2d) at 800.

In *McNulty v. Owens, supra,* this Court sustained an act which provided for farm owners conveying to the public body one acre lots on which rental housing for tenants of low income would be built. Under the act, the farm owner retained an option to re-acquire the acre including the dwelling at a "fair value". The fact that provision was made for private ownership did not destroy the public purpose of the act.

On the basis of the above authority we find the appellant's argument unconvincing and conclude that the fact private ownership is promoted by the present Act does not transform it into legislation for private purposes.

The appellant's contention that not all the designated beneficiaries of the Act live in slum or blighted areas and that some would have income higher than the average for the State is essentially an attack on the legislative findings. She apparently feels the Legislature erred in finding that higher income level beneficiaries suffer from a shortage of affordable, safe and sanitary housing.

"[L]egislative findings and declarations have no magical quality to make valid that which is invalid but they are entitled to weight . . . ." *Velishka v. Nashua,* 99 N. H. 161, 106 A. (2d) 571, 573, 44 A. L. R. (2d) 1406, 1411 (1954) ; *accord, Anderson v. Baehr, supra.*

The appellant has presented no evidence to refute the legislative finding that the beneficiary classes, as defined in the Act, are suffering from a shortage of safe and sanitary housing which they can afford. There being no facts of which we may take judicial notice which tend to negate these findings and being unable to say from their face that they are "clearly wrong", *McNulty v. Owens, supra,* 199 S. E. at 428, the appellant's argument is without merit. However, it should be pointed out that providing assistance to persons or families in the beneficiary classes who already occupy affordable, safe and sanitary housing would not comport with the purpose of the Act since the clear import of the Act is that assistance is authorized for members of the beneficiary classes only when safe or sanitary housing is unavailable and unaffordable by them.

The appellant's last contention under this exception—that there is nothing to indicate that the Act will eliminate substandard housing since there is no requirement that slums be razed—is apparently a challenge of the means the Legislature has chosen to attack the problem of substandard housing among lower income groups.

While the means chosen by the Legislature should be reasonably calculated to effectuate the purpose of an enactment, which, of course, must be a public one, "the means applied to achieve this purpose is largely within the discretion of the legislature," *Warren v. Nusbaum, supra,* 208 N. W. (2d) at 800. Given the problem which the Legislature has found to exist, we cannot say that the Act will not promote the health, safety, and welfare of the citizens of the State and will not, in fact, eliminate unsafe and unsanitary housing. Perhaps there are more direct methods of eliminating substandard housing. However, this Court cannot say that the means chosen in this instance are not reasonably calculated to alleviate the problem. The fact that this legislation is not a panacea which completely eliminates the problem does not offend the public purpose doctrine. There

is no requirement that the Legislature attack all aspects of a problem and the fact that it has chosen to address itself to only one of the causes behind the housing crisis under consideration—the unavailability of funds in the money market —renders the Act no less valid. *New Jersey Mortgage Finance Agency v. McCrane, supra.* As long as there exists a reasonable relationship between the public purpose to be achieved and the means chosen to effectuate that purpose, the legislation is not invalid because we may feel a different method would have been more effective. The sagacity of the method chosen by the Legislature is not subject to judicial review. *Martin v. Ellisor,* 266 S. C. 377, 223 S. E. (2d) 415 (1976).

IV.

Under her next exception, the appellant contends that the Act pledges the credit of the State for the benefit of private individuals and corporations in violation of express language in the S. C. Constitution that the credit of the State shall not be pledged or loaned for the benefit of any private individual or entity.[4] We find the appellant's position to be without merit.

Section 10 of the Act provides:

The notes, bonds or other obligations of the authority shall not be a debt or grant or loan of credit of the State or any political subdivision thereof and neither the State nor any political division thereof shall be liable thereon, nor shall they be payable out of any funds other than those of the authority and all notes, bonds and other obligations issued pursuant to this chapter shall contain on the face thereof a statement to such effect.

In view of this express provision, it is difficult to understand how the Act in any manner pledges the credit of the

---

[4] This provision is found in "new" Article X, § 11 which became effective November 30, 1977, and in "old" Article X, § 6 which was the effective provision when the Act was passed and this action was brought. Although there are slight changes in the "new" article, the changes are not material to this action and the issues under review.

State for the benefit of any private individuals or entities. The constitutional language relied upon by the appellant has been interpreted to mean that when the State is not subject to "pecuniary liability", the State's credit has not been pledged. *Elliott v. McNair, supra.* Section 10 of the Act in unambiguous language makes it clear that the State is not, and cannot in the future, be subjected to any pecuniary liability. Any attempt in the future, whether by the Legislature or otherwise, to fund any program authorized by this Act, either directly or indirectly, from tax revenues would be constitutionally prohibited.

## V.

The appellant next asserts that the Act improperly delegates legislative authority in violation of what has become known as the "non-delegation" doctrine. The doctrine, which is based on the constitutional requirement that the branches of government "be forever separate and distinct from each other", South Carolina Constitution, art. I, § 8, states simply that the Legislature may not delegate its power to make laws. The doctrine has been stated as follows:

It is well settled that while the legislature may not delegate its power to make laws, in enacting a law complete in itself it may authorize an administrative agency or board 'to fill up the details' by prescribing rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. . . . 'However, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits, and enjoin a procedure under which, by appeal or otherwise, both public interests and private rights shall have due consideration' . . .

The difficulty is in the application of these general principles, for there is no fixed formula for determining the

powers which must be exercised by the legislature itself and those which may be delegated to an administrative agency. *S. C. State Highway Dept. v. Harbin,* 226 S. C. 585, 86 S. E. (2d) 466, 470 (1955) (citations omitted).

Although the *Harbin* Court aptly pointed out the difficulty in determining where lawful delegation of power ends and unlawful delegation begins, the Court did offer a workable guideline for ascertaining the boundary when it stated that "[a] statute which in effect reposes an *absolute, unregulated, and undefined discretion* in an administrative body bestows arbitrary powers and is an unlawful delegation of legislative powers", 86 S. E. (2d) at 471 (quoting other authority) (emphasis ours). Stated another way, the Legislature may not vest unbridled, uncontrolled or arbitrary power in an administrative agency for, otherwise, the courts, when presented with a challenge of the agency's actions, would, there being no limitations on the agency's authority, be unable to judicially review its actions. In such a case, a citizen aggrieved by an agency action would be deprived of his due process rights under the State and Federal Constitutions.

In determining whether a statute vests unbridled, uncontrolled or arbitrary power in an administrative agency, we must consider the administrative actions the act affirmatively permits, *S. C. State Highway Dept. v. Harbin, supra.* In addition, we examine the entire act in light of its surroundings and objectives and are not restricted to the ascertainment of standards in express terms if they may reasonably be implied from the entire act. *Ward v. Scott,* 11 N. J. 117, 93 A. (2d) 385 (1952). All reasonable doubt must be resolved in favor of constitutionality and if a constitutional construction is possible, it should be followed. *Casey v. S. C. State Housing Authority, supra.*

In support of her exception on delegation, the appellant makes, for the most part, rather generalized arguments in regard to the discretion vested in the

Authority. However, she does set forth some specifics. After pointing out that Section 5A limits the maximum interest rate that may be charged a member of the beneficiary class to "a rate equal to one percent less than the prevailing [maximum rate in the] State real estate usury laws", she asserts the Act vests unbridled discretion in the Budget and Control Board since the section further permits the Board to lift this ceiling "after such investigation and hearing as the board may deem necessary".

The appellant also contends that Section 6 impermissibly vests absolute and unchecked discretion in the Budget and Control Board. That section provides, in part:

If the Budget and Control Board shall determine that the funds estimated to thereafter be available for the repayment of the authority's notes and bonds, including the proposed notes or bonds, will be sufficient to provide for the payment of the principal and interest on the authority's notes and bonds thereafter to be outstanding as they become due, the Budget and Control Board is authorized to give its approval to the issuance, in whole or in part, of the proposed notes or bonds, subject to such conditions, if any, as it may impose.

The appellant further sees an infirmity in Section 5(1)(a) because, according to her, except for a first year limitation in Section 6A, the Authority may issue notes and bonds to execute the various programs without limitation as to amount, value, lien priority, interest rates, property value "or any other control thereupon".

In viewing the Act in its entirety, we fail to see that the specific provisions cited by the appellant vest uncontrolled, unbridled, or absolute discretion in the Authority or Budget and Control Board. The legislative objective evidenced in the Act is to render assistance to those members of the beneficiary class in need of safe and sanitary housing, but who cannot afford such housing. The assistance is to be in the form of passing on to the beneficiaries of the Act, to the greatest extent possible, the benefits of the more favorable

interest rates the Authority will expectantly be able to obtain on the obligations issued by it. Further the activities of the Authority are to be supported and its obligations retired from the loan repayments made by borrowers from the Authority. The Authority (and the Budget and Control Board in situations where it has been granted responsibilities in overseeing operations of the Authority) must act within these parameters and the other specific directives of the Act. The Act must be administered in accordance with the objectives set out by the Legislature.

The Authority does have the power to set the interest rate on loans directly or indirectly made to members of the beneficiary classes. The Budget and Control Board has the power to waive the ceiling specified in Section 5A. However, neither may act arbitrarily in exercising these powers. In taking into account any underlying factual considerations (such as the interest rates at which the Authority can place its issues at any given time), both must make a determination that the objectives of the Act will be effectuated by their decisions. Any abuse of this decision-making power is subject to judicial review.

The above is equally applicable to the appellant's other contentions. The Authority's power under Section 5A and the Board's power under Section 6 must be exercised to effectuate the legislation's objectives and must be directed toward insuring the integrity of the housing programs.

## VI.

Under the last exception, the appellant contends that the Act violates the equal protection clauses of the State and Federal Constitutions.

Unless some suspect criteria, such as race, is involved, it is elementary that the equal protection provisions are satisfied if the classification bears a reasonable relationship to a legitimate state interest which the Legislature seeks to effect and the constituents of each class

are treated alike under similar circumstances and conditions, *Elliott v. McNair, supra; Duke Power Co. v. Bell, supra.* The appellant does not challenge the Act on the basis that the classifications made by it are arbitrary and without a reasonable relationship to legitimate state objectives. Instead, her argument is apparently directed to the second requirement—that being that all members of the beneficiary class must be treated equally under similar circumstances. The basis for her attack is closely related to her argument on the delegation issue for she claims there are no standards in the Act to assure fair and equal access to the benefits of the Act and, thus, there is leeway for arbitrary distribution of available funds. We find the argument without merit.

First, there are discernible standards under the Act for determining who is entitled to assistance. Obviously, the person or family must fall within either the low or low to moderate income class and, in view of the clear directive that the activities of the Authority be self-supporting, the person or family must be capable of making rent or mortgage payments on the housing that would be made available through the various programs of the legislation.[5]

With regard to the requirement that all members of a classification be treated equally under similar circumstances and conditions, assistance is clearly avail-

---

[5] Other than the implicit directive that beneficiaries be able to make rent or mortgage payments to be entitled to assistance, there are no criteria in the Act to guide the Authority in the determination of who will be able to make rent and mortgage payments. However, this is necessarily a factual determination which is subject to judicial review and does not constitute a delegation of unbridled and uncontrolled discretion. "Given the complexity of the instant program, it is not objectionable that 'many things upon which wise and useful legislation must depend which cannot be known to the law-making power, . . . must, therefore, be a subject of inquiry and determination outside of the halls of legislation'." *Johnson v. Pennsylvania Housing Finance Agency,* 453 Pa. 329, 309 A. (2d) 528, 535 (1973) (citations omitted).

This, of course, presupposes that the Housing Authority will promulgate regulations, which it is empowered to do, governing the determinations which the Act allows to be made "outside the halls of legislation". While separate from the issues before the Court, should the Authority fail to issue appropriate regulations, the administration of the Act may be subject to due process and equal protection attacks. See Davis, Administrative Law Treatise, 1970 Cum. Supp. § 2.00-6, pp. 58-62.

able to all persons and families meeting the qualifications of the Act. It is no objection that some members of the beneficiary classes will be unable to meet the qualifications for "[a]n otherwise valid statute or ordinance conferring a privilege is not rendered invalid merely because it chances that particular persons find it hard or even impossible to comply with precedent conditions upon which enjoyment of the privilege is made to depend." 16 Am. Jur. (2d) Constitutional Law, § 530 (1964). Because the enactment directly attacks only one aspect of the affordability problem, the cost of safe and sanitary housing, and not the concomitant aspect, lack of financial resources on the part of beneficiaries, it does not constitute a denial of equal protection.

Affirmed.

LEWIS, C. J., LITTLEJOHN and NESS, JJ., concur.

GREGORY, J., concurs in result.

GREGORY, Justice (concurring in result):

I agree that Act No. 76 of 1977 serves a valid public purpose and would affirm the lower court for that reason.

In *Casey v. State Housing Authority*, 264 S. C. 303, 215 S. E. (2d) 184 (1975) this Court declared Act No. 1171 of 1974 unconstitutional on the ground it involved a pledge of the State's credit for the benefit of private individuals in violation of Article X, Section 6 of our constitution. The housing scheme of Act No. 76 of 1977 is the same basic scheme employed by the 1974 Act. In *Casey,* that scheme was declared to serve a private purpose. Today it is determined to serve a public purpose.

In my view, by holding Act No. 76 of 1977 serves a valid public purpose we remove the constitutional impediment to funding this project with tax revenues.