# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

David Wesley Climer and Carol Herring, Petitioners,

v.

Curtis M. Loftis Jr., in his capacity as the State Treasurer of South Carolina, Respondent,

and

Thomas C. Alexander, in his official capacity as President of the South Carolina Senate; and G. Murrell Smith Jr., in his official capacity as Speaker of the South Carolina House of Representatives, Intervenors-Respondents.

Appellate Case No. 2025-001111

---

## IN THE ORIGINAL JURISDICTION

---

Opinion No. 28306
Heard October 22, 2025 – Filed November 12, 2025

---

## INJUNCTION GRANTED

---

Richard A. Harpootlian, Andrew R. Hand, and Phillip Donald Barber, all of Richard A. Harpootlian, PA, of Columbia, for Petitioners David Wesley Climer and Carol Herring.

M. Dawes Cooke Jr. and John William Fletcher, both of Barnwell Whaley Patterson & Helms, LLC, of Charleston; and Shawn David Eubanks and Christopher Alton Majure,

both of South Carolina Treasurer's Office, of Columbia, all for Respondent Curtis M. Loftis, Jr.

Kenneth M. Moffitt, John Potter Hazzard V, and Cassidy Evans Murphy, all of Columbia; Sara Stinson Parrish, of Burr & Foreman LLP, of Daniel Island; and Tracey Colton Green, of Burr & Foreman LLP, of Columbia, all for Intervenor-Respondent President Thomas C. Alexander; Mark Carroll Moore and Michael Antonio Parente, both of Maynard Nexsen PC, of Columbia; and Andrew A. Mathias and Julia McDonald Tillman, both of Maynard Nexsen PC, of Greenville, all for Intervenor-Respondent Speaker G. Murrell Smith Jr.

John Vernon Crangle, of Columbia, *pro se* Amicus Curiae.

---

**PER CURIAM:**  In separating the government's powers between the three branches of government, the federal and state constitutions confer to the legislative branch the exclusive authority to control and apportion the government's money. Concomitantly, since our nation's founding, there have been concerns with federal and state legislators wielding this power to increase their own compensation.  The South Carolina Constitution addresses this concern by prohibiting legislators from raising the pay of current legislators, but permitting legislators to raise the pay of future legislators.  *See* S.C. Const. art. III, § 19; *Scroggie v. Scarborough*, 162 S.C. 218, 227, 160 S.E. 596, 600 (1931).[1]

Our General Assembly has scrupulously honored this constitutional provision over the years, declining to raise legislators' salaries at all—even for future legislators—for nearly forty years.  Nonetheless, in 1984, in recognition of the ever-growing extent of legislative duties outside of the regular session, the 105th General Assembly began appropriating $300 per legislator per month as a "legislative expense allowance" intended to reimburse legislators for their official expenses

---

[1] The Twenty-Seventh Amendment to the United States Constitution provides a similar solution to the federal side of the problem.  *Cf.* U.S. Const. amend. XXVII ("No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.").

incurred while serving their districts outside of the statehouse. Over the years, the terminology—and, perhaps, the purpose—of the appropriation was changed to "in-district compensation," but the amount appropriated remained the same, being raised only once in the intervening forty years (to $1,000, in 1994).[2]

The General Assembly's fiscally cautious approach to increasing legislators' salaries and in-district compensation means neither of those amounts have kept pace with inflation; indeed, the current amounts appropriated for either are paltry in comparison to the time, energy, and effort it takes to serve South Carolinians as a state legislator. Perhaps in recognition of that fact, this year, the 126th General Assembly at last raised the amount of in-district compensation from $1,000 to $2,500 per month per legislator—almost equaling the amount of inflation from the last increase in 1994. *See generally* Act No. 69, 2025 S.C. Acts ---, --- (setting forth in proviso 91.13 (the proviso): "All members of the General Assembly shall receive an in-district compensation of $2,500 per month."). However, unlike the 1994 increase (which was made effective for a future legislature), the proviso's increase was to become effective at the start of the 2025-2026 fiscal year, while the 126th General Assembly still presided.[3] Governor McMaster signed the 2025-2026 Appropriations Act (the Act)—including the proviso—into law on June 3, 2025.

Three days later, Petitioners David (Wes) Climer[4] and Carol Herring filed a petition for a writ of injunction in the Court's original jurisdiction, seeking to enjoin the State Treasurer from disbursing the funds for the proviso under the Act. Both bodies of the General Assembly separately intervened.[5] We issued a temporary injunction on

---

[2] That increase in compensation was delayed until the following legislative session. *See* Act No. 497, 1994 S.C. Acts 5129, 5477–78 ("All members of the General Assembly shall receive an in district compensation of $300 per month for the months of July, 1994 through December, 1994. All members of the General Assembly shall receive an in district compensation of $1,000 per month effective January 1, 1995.").

[3] The 127th General Assembly will not be seated until January 2027. In South Carolina, general elections occur in even years (i.e., 2020, 2022, 2024, 2026), whereas a new General Assembly is seated in odd years (i.e., 2021, 2023, 2025, 2027).

[4] Petitioner Climer is a state senator and, thus, a member of the General Assembly. Senator Climer opposed increasing the in-district compensation to $2,500 but voted in favor of the Appropriations Act as a whole.

[5] Section 15-53-30 of the Uniform Declaratory Judgments Act provides that "[a]ny

June 25, 2025. No payments pursuant to the proviso have been made at this point. This means that, because the proviso does not distinguish between the amount of the increase versus the long-standing amount appropriated for in-district compensation, the temporary injunction unavoidably halted not only payments for the increase, but also payments of the original $1,000 per month payments that legislators have received since 1994.

Article III, Sections 9 and 19 of the South Carolina Constitution provide, respectively, "Members of the General Assembly shall not receive any *compensation* for more than forty days of any one session," and "[N]o General Assembly shall have the power to increase the *per diem* of its own members." (Emphasis added). While the modern understanding of "compensation" and "per diem" are distinct, our constitution and case law have long equated the two terms as they are used in Article III, Sections 9 and 19.[6] As a result, it has been understood historically that the South

person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." S.C. Code § 15-53-10 (2005). Section 15-53-80 provides in pertinent part, "If the statute . . . is alleged to be unconstitutional the Attorney General shall also be served with a copy of the proceeding and be entitled to be heard." S.C. Code Ann. § 15-53-80 (2005).

Petitioners served the Attorney General with their pleadings. The Attorney General's office advised the Court in email correspondence that "[t]he Attorney General does not intend to appear and file a brief in this case. Although this office received the Petition in this case, the Attorney General was not named as a party in this case."

[6] *Compare, e.g.*, S.C. Const. of 1790, art. I, § 18 (entitling legislators "to receive . . . as compensation for their expenses, a sum not exceeding seven shillings sterling a day, during their attendance on, going to, and returning from the legislature; but the same may be increased or diminished by law, if circumstances shall require; but *no alterations shall be made by any legislature to take effect during the existence of the legislature which shall make such alteration*" (emphasis added)), *and* S.C. Const. of 1861, art. I, § 26 (same), *and* S.C. Const. of 1865, art. I, § 26 (same), *and* S.C. Const. of 1868, art. II, § 23 (providing that legislators "shall receive such compensation as shall be fixed by law; but *no General Assembly shall have the power to increase the compensation of its own members*" (emphasis added)), *with* S.C. Const. art. III, § 19 ("[N]o General Assembly shall have the power to increase the *per diem* of its own members." (emphasis added)); *see also, e.g.*, *Scroggie v. Bates*, 213 S.C. 141, 152, 48 S.E.2d 634, 639 (1948) (per curiam) ("The evident purpose of that provision in

Carolina Constitution prohibits members of the General Assembly from raising the compensation of current legislators but not future legislators.[7] *See, e.g., Bates*, 213 S.C. at 152, 48 S.E.2d at 639 ("There is no prohibition in the Constitution against Legislators providing adequate compensation for the members of each House of an incoming General Assembly. The only prohibition is against voting themselves additional compensation during their term as members of that Body.").

The state constitution, however, does not forbid the General Assembly from increasing the amount appropriated to cover official expenses, i.e., "those that are necessary to enable the Legislature to properly perform its functions"—and we most assuredly do not question that authority here. *Scarborough*, 162 S.C. at 227, 160 S.E. at 600 ("We know of no case in which it is held that the payment of official expenses . . . is in violation of a provision of a Constitution prohibiting an increase in, or limiting the amount of, 'compensation' . . . ."). It cannot be denied that, over the past century, legislative service has evolved considerably from what it once was, essentially requiring year-round service both in and outside of the legislative session. The increased demands of modern legislative service naturally could lead the General Assembly to appropriate a greater amount of public funds to reimburse legislators for official expenses incurred in carrying out their official duties. The question here, therefore, becomes whether the increase in "in-district compensation" may be construed to amount to official expense reimbursement (which the

the Constitution to the effect that members of the General Assembly shall not increase the *per diem* of its own members during their term of office was to prevent the General Assembly from fixing a *compensation* for themselves different from that provided by law when they offered themselves as candidates for the General Assembly." (emphasis added)); *Godfrey v. Hunter*, 176 S.C. 442, 448, 180 S.E.2 468, 470 (1935) (per curiam) (looking behind the appropriations act's classification of a certain payment as an "expense allowance," and determining that the true intent behind the payment was per diem compensation); *Scarborough*, 162 S.C. at 227, 160 S.E. at 600 ("It is a well-recognized principle that, in whatever language a statute may be framed, its purpose and its constitutional validity must be determined by its nature and reasonable effect. So, if it should be found in the case at bar that the effect of the appropriation in question is to increase the *compensation* of members of the General Assembly, such appropriation would be clearly unconstitutional." (emphasis added) (citation omitted)).

[7] Indeed, during the oral argument before this Court, Respondents' counsel conceded the General Assembly could not raise its own salary, regardless of whether it was calculated and paid by day (per diem), by week, or by month.

constitution permits) or to an increase in compensation for the sitting General Assembly (which the constitution forbids).

In accordance with our deferential standard of review, we must presume legislative enactments are constitutional and uphold the validity of an enactment unless its repugnance to the constitution is clear beyond a reasonable doubt. *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999). Here, however, the General Assembly has given us nothing on which to presume the money budgeted for in the proviso will be used only for official expenses—in fact, as Petitioners argue, the signs point to the contrary. Specifically, the language of the proviso itself states it is for "in-district *compensation*." (Emphasis added). There is no other language in the proviso or the Act as a whole that even hints that the legislators' use of the funds is limited to only official expenses. Moreover, the amount of in-district compensation is characterized as true "compensation" (i.e., gross income) for the purposes of both federal income taxes[8] and retirement benefits.[9]

---

[8] *See* I.R.C. § 61(a)(1) (2025) ("Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items . . . ."). However, the Internal Revenue Code will allow legislators to deduct this amount should they prove they spent it on official expenses. *See* I.R.C. § 62(a)(2)(A) (2025) (defining "adjusted gross income" as gross income minus allowable deductions, including, *inter alia*, "expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer").

[9] *See, e.g.*, S.C. Code Ann. § 9-9-10(13) (2019) (defining "earnable compensation" for legislators as "forty times the daily rate of renumeration, plus twelve thousand dollars [(i.e., the prior amount of in-district compensation)], of a member of the General Assembly"); *General Assembly Retirement System*, PEBA: S.C. Ret. Sys. & State Health Plan, https://www.peba.sc.gov/gars#:~:text=Service%20 purchase%20options.,decisions%20about%20your%20financial%20future (last visited Nov. 4, 2025) ("You contribute a tax-deferred 11% of your gross pay, which includes your salary, *in-district expense* and, if applicable, additional line item compensation." (emphasis added)); *General Assembly Retirement System Member Handbook: Fiscal Year 2026*, PEBA: S.C. Ret. Sys. & State Health Plan 4, 11, https://www.peba.sc.gov/sites/default/files/gars_handbook.pdf (same); *South Carolina Retirement System*, PEBA: S.C. Ret. Sys. & State Health Plan,

Notwithstanding this Court's strong and longstanding respect for the separation of powers and legislative deference, where a legislative enactment clearly contravenes our constitution, we have a duty to declare the legislative enactment unconstitutional. *See, e.g.*, *Thomas v. Macklen*, 186 S.C. 290, 305, 195 S.E. 539, 545 (1938); *Cohen v. Hoff*, 7 S.C.L. (2 Tread.) 657, 658–59 (1814). It is for this reason that we are constrained here to find that Petitioners have met their burden to show the proviso is unconstitutional beyond a reasonable doubt. No matter how well-intentioned or long-overdue, the result of the 126th General Assembly's increase in in-district compensation *without either limiting language in the proviso or delaying implementation of the increase to the seating of the 127th General Assembly* is to increase its own compensation, which our state constitution expressly prohibits. We therefore permanently enjoin payment of the funds covered by the proviso. *Cf. Bates*, 213 S.C. at 147, 48 S.E.2d at 636 ("The Court's opinion as to the wisdom of the law must be excluded. The Court has no concern here as to whether the pay of Legislators is inadequate or excessive."); *McLain v. Hayne*, 5 S.C.L. (3 Brev.) 291, 293 (1812) ("[I]t is not for the judiciary to usurp legislative powers, and alter and amend the law, as may be thought proper or necessary.").[10]

---

https://www.peba.sc.gov/scrs#:~:text=Monthly%20retirement%20benefit%20is%20based,if%20provided%20by%20your%20employer (last visited Nov. 4, 2025) ("You contribute a tax-deferred 9% of gross pay.").

[10] As a final matter, we address the House and Senate's contention that Petitioners lack standing. We agree in part: Petitioner Climer does not have standing. It is improper for a sitting member of the General Assembly to challenge in court an action of the legislature of which he is a member—particularly when that action is one of which he voted in favor. Absent an incredibly rare situation (which is not presented here), we strongly discourage disgruntled members of the General Assembly from using this Court as a forum in which to vent their grievances with the body they serve. *See generally Newman v. Richland Cnty. Hist. Pres. Comm'n*, 325 S.C. 79, 83, 480 S.E.2d 72, 74 (1997) ("We have held that where a governmental employee could not maintain a suit in his official capacity because the posture of the suit was such that he was suing himself, he also could not proceed with the matter under the guise of appearing as a citizen and taxpayer." (cleaned up) (citation omitted)). Nonetheless, it is clear Petitioner Herring has public importance standing, so Petitioner Climer's lack of standing does not affect the need for us to resolve this case on the merits. *See generally S.C. Pub. Int. Found. v. S.C. Dep't of Transp.*, 421 S.C. 110, 118–19, 804 S.E.2d 854, 859 (2017) (setting forth the requirements to establish public importance standing); *Sloan v. Greenville Cnty.*, 356 S.C. 531, 551,

**INJUNCTION GRANTED.**

**KITTREDGE, C.J., FEW, JAMES, HILL and VERDIN, JJ., concur.**

---

590 S.E.2d 338, 349 (Ct. App. 2003) (explaining that public importance standing allows "interested citizens a right of action in our judicial system when issues are of significant public importance[, thus ensuring] accountability and the concomitant integrity of government action").